593 So.2d 13 (1991)
Eunie Irene CHERRY
v.
Harold CHERRY.
No. 90-CA-0856.
Supreme Court of Mississippi.
December 31, 1991.
*14 Polly J. Covington, Quitman, for appellant.
Thomas T. Buchanan, Laurel, for appellee.
Before HAWKINS, P.J., and PITTMAN and McRAE, JJ.
PITTMAN, Justice, for the Court:
Eunie Irene Cherry filed suit in Wayne County Chancery Court for divorce from her husband, Harold Cherry, on the ground of habitual cruel and inhuman treatment. She also asked the chancery court to divide the property of the parties, and to grant her custody of the parties' minor child, Amanda. The chancery court denied the divorce. It did order Harold Cherry to pay $500.00 in child support for Amanda, who remained in the custody of her mother. We reverse and remand on the issue of the denial of a divorce. We also remand for further proceedings not inconsistent with this opinion to determine the issues of property division, alimony, and proper medical expenses of the minor child covered by Harold Cherry. We have no argument with the $500.00 per month child support award.

I.
Eunie Irene Cherry and Harold Cherry were married on January 20, 1967. Three children were born of the marriage: Alton D. and Eddie, born on April 19, 1968; and Amanda, born on July 23, 1976. Alton and Eddie have reached the age of majority, and their care and custody is not an issue on this appeal.
On December 28, 1989, Irene Cherry filed for divorce in Wayne County Chancery Court. She alleged habitual cruel and inhuman treatment on the part of her husband, or in the alternative, irreconcilable differences. Irene requested an equitable division of the couple's property, attorney's fees, custody of Amanda and child support for her, alimony for herself, and for Harold to procure medical and dental insurance for Amanda and to pay all of Amanda's medical expenses not covered by the insurance.
Harold Cherry filed his answer to Irene Cherry's complaint for divorce on May 24, 1990. He denied the allegations of the complaint and did not raise any affirmative defenses.
The hearing in this cause was held on May 30, 1990. Harold Cherry was called as an adverse witness. He testified that he and Irene had separated in April of 1989, though he maintained that Irene had spent the night at their house three times during the summer of 1989, and twice in October of 1989. Harold had mostly good things to say about Irene. Harold earned a gross yearly salary of $36,765.00, doing maintenance work for Hood Industries in Waynesboro. He also earned around $1700.00 from doing farm work. The Cherrys' home was nearly twenty-two years old and was paid for. The house was located on eight or nine acres of property. Harold valued the house at $35,000.00-40,000.00. Harold *15 had a woodworking and mechanic shop, and he estimated that the tools in those shops had a value of $1250.00. He was not willing to sell and divide the property, or to let Irene have any part of it. Harold's son, Eddie Harold, lived in the house with him. According to Harold, the separation occurred in the following manner. Irene was gone for ten days to a convention. When she came home, she and Harold argued over a telephone call. The next day, Harold went to Mobile to buy some tires for his pick-up truck. When he returned, Irene was gone. She had left him a letter. Harold admitted that the couple had been having trouble for several years with sexual problems. Harold denied he regularly wore women's clothes and masturbated in front of his wife, but admitted that he did put on women's clothes once. He stated that the trouble lasted about a year and a half. He admitted that he had gone to see a psychiatrist about his troubles, but not until after he and Irene had separated. Harold stated that he "didn't find no answers" at the doctor's, only speculation as to the cause of the problem. He denied that his problem had much of an effect on her. He stated that if she was unhappy, it was because her mother had died at around the same time. Harold admitted that he talked about killing himself, but didn't actually threaten to do it. He stated that, the times he dressed in women's clothing, he "guess[ed he] like[d] the feel of the women's material." Harold stated that he was willing to pay whatever the court set as far as child support.
Irene Cherry testified that she had worked during her marriage and had contributed to paying for their house and their other possessions. She stated that Harold deposited a certain amount in her checking account with which she ran the home and paid the bills. Everything else he kept and put in savings or somewhere. When Irene left Harold, she took a $15,000.00 certificate of deposit that was in her name and cashed it. She claimed that her husband had some savings or money invested in certificate of deposits, but she had little or no proof of this. She testified that after the separation Harold continued to put money in the bank, and she continued to pay the bills out of that amount, until December 1989, when she filed for divorce. From January through April Harold had paid $300.00 support for Amanda. He had paid nothing for May 1990.
According to Irene, Harold "could do nothing sexually." After accusing Harold of seeing another woman, she said that he admitted that he dressed in women's clothes. Apparently he would go to his mother-in-law's house frequently, at night and early in the morning. Irene stated that she talked to Harold, went to see a doctor, and urged Harold to do the same, but he never did until after the separation. Apparently this had occurred in 1986. She also claimed that Harold was very tight with money, that she could never please him, and that "he just fussed and fussed." She claimed that Harold's activities damaged her health, and she consulted Dr. Arthur Wood, Jr. Her health had improved since the separation.
Irene asked for her half of the real property owned by the parties, and specifically claimed as hers a piano, a bed, some antiques, a .22 rifle, some pictures, and her pots and pans. Irene admitted that when she left in April 1989, she wrote a letter to Harold, saying that she "needed a little time by myself," that Harold was "a wonderful person and a good worker," and that they would talk in the future and they could work things out if they loved each other. She admitted that she had stayed in her house for three days. She denied staying with Harold at any other time. Irene admitted that she had allowed photographs to be taken of her, partially clothed, at the photography studio where she worked. She stated that the pictures had been taken as practice of a type of boudoir photography that she and her employer had learned at a seminar. The pictures had been on file at the photography studio. She admitted that she knew a man named Dencil Smith. Her employer had hired him to do some work at the photography shop, and Irene had hired him to do some work at her apartment. She denied that there was anything going on between her and Smith, and *16 she also denied that Smith had ever spent the night in her apartment.
Patsy Henderson had known Irene Cherry for twenty years. Irene had worked at Patsy's photography studio, the Four Seasons Photography Studio, since 1981. Patsy stated that Irene had been severely depressed, anxious, and emotionally upset from 1986 to her separation in 1989. Prior to 1986, Irene had always left early so she could be home at 5:00 p.m., because Harold wanted that. After 1986, she started working nights, to get away from the problems she was having at home. Since the separation Patsy stated that Irene's condition had improved, in spite of Harold writing, bringing flowers, calling her, or coming by the shop. Patsy corroborated what Irene had said about the boudoir photography. She said that only she and Irene saw the pictures. As far as physical violence, Patsy stated that Harold had on one occasion "yank[ed] her around one day from one door slam into another one." This took place after the separation, in her studio.
Linda Moseley had known Irene Cherry for over twenty years. Linda had worked at the photography studio. Presently she saw Irene once or twice a month. Beginning in 1986, she testified that Irene would come to work depressed and upset, and act like she was in a trance. Linda knew that Irene's mother was sick at this time, and she felt that this was the reason why. She felt that Irene's condition had vastly improved recently. She corroborated what Patsy Henderson had said about Irene having to be home at 5 p.m. for so long, and then working nights, as if she didn't want to go home. Linda stated that Harold was a hard-natured person toward Irene and the children, that she had heard him yell at the children, and that "he was constantly on them and on Irene." She stated that Irene had some good things to say about Harold also, that he was a good provider and good father.
Dr. Arthur E. Wood, Jr., a family practitioner, treated Irene Cherry for stress from 1986 onward. Dr. Woods had seen her approximately 20 times from June 1986 to April 1990.
Eddie Harold Cherry, son of Irene and Harold, was Harold's first and only witness. Eddie testified that in 1989, the time of his parents' separation, relations had gotten cold and strained between Irene and Harold. They didn't argue, but they didn't get along. Eddie said that Irene stayed at work late, as if "she didn't want to come home anymore." He didn't know whether his father had done anything to cause that. Eddie claimed to have seen his mother sitting in another man's lap, and he claimed to have seen them kiss. Eddie recognized the boudoir photographs of his mother. He testified that his sister had brought them to him. Eddie then gave the pictures to his father. He also confronted his mother about his belief that she was seeing another man. According to Eddie, she told him that was none of his business. He agreed that his mother had often complained about her nerves, but denied that she had said that Harold was the problem. He said that his mother had always blamed him for her nerve problems, saying that "I stay in trouble a lot." Eddie stated that since his parents' separation, his mother had cut her hair, and had started wearing make-up. He didn't see her enough to comment on her emotional health.
The chancery court denied the divorce. It found that Mrs. Cherry had to some degree condoned Mr. Cherry's perverted sexual activities. The court stated that it might have granted a divorce had one been requested early on, but since that time, Mrs. Cherry had engaged in conduct that was almost as bad as Mr. Cherry's. The court further stated: "The reason I'm denying the divorce is because I don't believe under the laws of this state the Court can condone the conduct of either one of you." Irene kept custody of Amanda, and Harold was ordered to pay $500.00 per month for support. Harold was given rights of visitation. The household furnishings were divided equally.

II.
Irene Cherry argues that the chancellor's failure to grant her a divorce on the grounds of habitual cruel and inhuman *17 treatment was against the overwhelming weight of the evidence. The applicable standard, as stated in Wilson v. Wilson, 547 So.2d 803, 805 (Miss. 1989), is the following:
[T]his Court has consistently held that habitual cruel and inhuman treatment could be established only by a continuing course of conduct on the part of the offending spouse which was so unkind, unfeeling or brutal as to endanger, or put one in reasonable apprehension of danger to life, limb or health, and further, that such course of conduct must be habitual, that is, done so often, or continued so long that it may reasonably be said a permanent condition.
See also Gallaspy v. Gallaspy, 459 So.2d 283 (Miss. 1984).
One similar case is Crutcher v. Crutcher, 86 Miss. 231, 38 So. 337 (1905), which stated that pederasty on the part of a spouse, like sodomy, amounted to habitual cruel and inhuman treatment. The Court stated that "[u]nnatural practices of the kind charged here are an infamous indignity to the wife, and which would make the marriage relation so revolting to her that it would become impossible for her to discharge the duties of wife, and would defeat the whole purpose of the relation." Crutcher, 86 Miss. at 231, 38 So. at 337.
Crutcher was cited for authority in Stockton v. Stockton, 203 So.2d 806 (Miss. 1967). Mr. Stockton allegedly asked Mrs. Stockton to engage in unnatural sexual relations, and also suggested that they whip each other. Subsequently, Mr. Stockton allegedly suggested that Mrs. Stockton engage in similar relations with another man. These actions took place over a time period of six to eight months. This Court affirmed the chancery court's grant of a divorce based on habitual cruel and inhuman treatment. One thing appears clear; without the testimony concerning Harold Cherry's sexual problems, there is insufficient evidence to grant the divorce.
Harold Cherry stated that he had dressed up like a woman one time when "me and my wife were making love." He stated that he had trouble with sexual relations for "[a] year and a half." He did not go to a psychiatrist for this until after the separation. Later he said, apparently referring to dressing like a woman, that "[t]he few times that I did, I guess I like the feel of the women's material." He later stated on cross-examination that the problems were limited in time to 1986.
Irene Cherry testified that she first noticed that her husband was impotent in 1986. She believed he was seeing another woman. According to her, Harold confessed to having dressed in Irene's mother's clothes on several occasions.
Irene Cherry testified that her husband's behavior "like to drove her insane." She also complained of migraines. She consulted Dr. Wood, who apparently prescribed anti-depressants. While we have unique facts in this case, the evidence is sufficient to grant a divorce, and the chancellor erred in not doing so. The only question is whether the condonation and recrimination, as the chancellor mentioned in his opinion, are applicable. If so, then the divorce could be denied even if the proof of habitual cruel and inhuman treatment was sufficient.

A. Condonation
In its opinion the chancery court stated that, as to Harold's peculiar activities, Irene "knew it, and to some degree condoned it," by continuing to live with Harold. The court also mentioned that Irene and Harold had stayed together on a few occasions since the separation, and had at least attempted to have sexual relations. As to Harold's behavior, the court stated that it "might have done something about it had some action been taken at that time."
The defense of condonation was summarized in Wood v. Wood, 495 So.2d 503, 505 (Miss. 1986):
Condonation is the forgiveness of a marital wrong on the part of the wronged party. Condonation may be expressed or implied. The mere resumption of residence does not constitute a condonation of past marital sins and does not act as a *18 bar to a divorce being granted. Condonation, even if a true condonation exists, is conditioned on the offending spouse's continued good behavior. If the offending party does not mend his or her ways and resumes the prior course of conduct, there is a revival of the grounds for divorce. In practical effect, condonation places the offending spouse on a form of temporary probation. Any subsequent conduct within a reasonable time after resumption of cohabitation which evidences an intent not to perform the conditions of the condonation in good faith, may be sufficient to avoid the defense of condonation, even though the conduct so complained of in and of itself may not be grounds for divorce. An entire course of conduct rule applies. A party's conduct both before and after the alleged condonation can be joined together to establish the cause for divorce.
(citations omitted).
"Habitual cruel and inhuman treatment is an offense of a continuing nature and is not condoned by the mere continuance of cohabitation." Chaffin v. Chaffin, 437 So.2d 384, 386 (Miss. 1983); see also Miss. Code Ann. § 93-5-4 (Supp. 1990) ("It shall be no impediment to a divorce that the offended spouse did not leave the marital domicile or separate from the offending spouse on account of the conduct of the offending spouse"). Irene Cherry should not be penalized for attempting to save her marriage. If condonation was a factor in the lower court's denying the divorce, then it was not of a sufficient nature to deny Irene a divorce.

B. Recrimination
Though the chancellor did not use the term recrimination explicitly, he did refer to Irene's behavior: "But, since that time (when Harold's peculiarities were discovered) she has engaged in some conduct that, quite frankly, is not quite as bad but almost as bad. There is even testimony by her own child that she is going with another man now. It's believable because of these pictures that are here." It is not clear that recrimination was actually a reason that the divorce was denied. This Court has stated, on the matter of recrimination:
The doctrine of recrimination is founded on the basis that the equal guilt of a complainant bars his/her right to divorce, and the principal consideration is that the complainant must come into court with clean hands. Oberlin v. Oberlin, 201 Miss. 228, 29 So.2d 82 (1947); Joy v. Miles, 190 Miss. 255, 199 So. 771 (1941); Dunn v. Dunn, 156 Miss. 132, 125 So. 562 (1930). The complainant's offense need not be the same offense charged against his spouse, but it must be an offense sufficient to constitute a ground for divorce. Oberlin, supra.

Parker v. Parker, 519 So.2d 1232, 1235 (Miss. 1988). It is not mandatory for a chancellor to deny a divorce when recrimination is established by sufficient evidence. Miss. Code Ann. § 93-5-3 (1972).
Irene Cherry was criticized by the court for two actions: allowing the boudoir photographs of herself to be taken, and for seeing a man other than her husband. The first action could not qualify as recrimination, as it is not an offense sufficient to constitute a ground for divorce. Its importance is that, according to the chancellor, it made the second alleged action more believable.
Even if the testimony of Eddie Cherry was true, recrimination would still not be available as a defense. Eddie's testimony that he had seen his mother sit on the lap of a man other than her husband and kiss him would not qualify as a ground for divorce. It is not habitual cruel and inhuman treatment, as there is no testimony as to the habitual nature of the act. It may well have happened only once, and there is also no testimony that Harold Cherry even knew about the alleged relationship. As such it appears that recrimination is not available to deny a divorce to Irene Cherry in this case.

III.
We hold that a divorce should have been granted, and the case must be remanded for further hearing, as the proof is incomplete *19 on the matter of the couple's finances. For instance, Harold Cherry apparently filled out an income and expense statement, but it is not included in the record. The chancellor need now consider Irene's claims as to what to do with the marital home and real property. Though it seems logical that the Cherry's are joint tenants, we find no proof of this in the record. On remand, the chancellor may consider the matter of partition, or some alternative remedy, such as a lump sum alimony award, or exclusive use and possession of the marital home, under Johnson v. Johnson, 550 So.2d 416 (Miss. 1989); see also Gray v. Gray, 562 So.2d 79 (Miss. 1990) (wife given exclusive use and possession of marital home, not subject to partition).

IV.
Irene Cherry contends that the chancellor erred in awarding only $500.00 per month for support of the minor child, Amanda, in failing to require the defendant to maintain medical insurance for Amanda, and in requiring only Irene Cherry to pay expenses not covered by such insurance. Considering the evidence that is available, we have no argument with the $500.00 per month child support award. Divorce or no divorce, and despite the lack of evidence on this matter, Harold Cherry may be required to provide his minor daughter with medical insurance, and may pay at least one-half the expenses not covered by such insurance.
The issue of alimony will have to be decided. Whether to award alimony, and the amount to be awarded, are largely within the discretion of the chancellor. Brendel v. Brendel, 566 So.2d 1269 (Miss. 1990). The facts of this case do not preclude alimony, dependent on the amount of other marital property which Irene might receive on remand.

V.
Finding that reversible error was committed below, the judgment of the chancery court denying a divorce to Irene Cherry is reversed and remanded. The issues of property division, child support and alimony are also remanded to the chancery court for further consideration.
REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, ROBERTSON, SULLIVAN, BANKS and McRAE, JJ., concur.
DAN M. LEE, P.J., dissents with separate written opinion.
DAN M. LEE, Presiding Justice, dissenting:
I would affirm the chancellor's denial of a divorce to the parties. I am of the opinion that the majority position transgresses our limited scope of review in domestic relations matters. Our scope of review of a chancellor's factual findings is borne of necessity. As a court of review, we are bound to extend considerable deference to the lower court since the chancellor has the obvious advantage of evaluating the credibility of the parties and the witnesses firsthand.
[T]his Court is constrained by its limited scope of review, particularly when, as here, the resolution of the case turns on the credibility of the witnesses. When there are before us only general findings of fact, this Court proceeds on the assumption that the court below resolved all fact issues in favor of the appellee. Ross v. Brasell, 511 So.2d 492, 495 (Miss. 1987).
Jones v. Jones, 532 So.2d 574, 578 (Miss. 1988).
Stated differently, this Court will not reverse a chancellor's finding of fact unless such fact is deemed to be clearly erroneous. "[T]hat is, although there is evidence to support it, we are on the entire evidence left with the definite and firm conviction that a mistake has been made." Estate of Robinson v. Gusta, 540 So.2d 30, 33 (Miss. 1989).
I am left with no definite or firm conviction that the chancellor erred in his findings *20 of fact as such findings pertain to the denial of the divorce. Consequently, I respectfully dissent.