IRVING, J.,
for the Court.
¶ 1. The Hinds County Chancery Court granted William Ware (Billy) a divorce from Patti Hughes Ware on the ground of uncondoned adultery. The chancellor divided the marital property and awarded Patti both lump sum and rehabilitative alimony. After the final judgment was entered, Patti asked the chancellor to reconsider her defense of condonation; however, the chancellor denied her request. Feeling aggrieved by the chancellor’s ruling, Patti appeals and asserts: (1) that the chancellor erred by granting Billy a divorce because of the doctrine of recrimination, (2) that the chancellor erred by granting Billy a divorce on the ground of uncondoned adultery, and (3) that the chancellor erred in enforcing their ante-nuptial agreement.
¶ 2. Finding no error, we affirm.
FACTS
¶ 3. Billy and Patti married on February 1, 1992, and separated on March 17, 2004. On August 27, 2004, Billy filed a complaint seeking a divorce on the ground of habitual drunkenness or, alternatively, for irreconcilable differences. Patti responded by filing a “Response and Counter-Complaint for Petition for Separate Maintenance and Other Relief.” On November 19, 2004, Billy filed an amended complaint adding the ground of uncondoned adultery. Patti answered the amended complaint and asserted the affirmative defenses of recrimination, condonation, and collusion. On August 19, 2005, Billy amended his complaint a second time, adding habitual cruel and inhuman treatment as a ground for divorce.
¶ 4. Patti filed a motion to bifurcate the proceedings, asking the court to determine whether Billy had proven that he was entitled to a divorce before addressing the financial matters and equitable division of the marital estate. The chancellor granted Patti’s motion, allowing issues relating to the grounds for divorce to be presented first. At the conclusion of the hearing, the chancellor found that Billy was entitled to a divorce on the ground of uncondoned adultery; however, the chancellor did not enter a judgment of divorce. On January 23, 2006, Patti filed a “Motion and Affidavit for Partial Summary Judgment” where *273 in she asked the court to declare an ante-nuptial agreement that she had signed on January 30,1992, null and void. A hearing was held on January 24, 2006, and the chancellor determined that the agreement was valid and entered an order to that effect on February 8, 2006. In April 2006, the chancellor heard testimony relating to alimony and the division of assets. The chancellor entered a final judgment of divorce on December 14, 2006.
¶ 5. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
ANALYSIS AND DISCUSSION OF ISSUES
¶ 6. This Court employs a limited standard of review of domestic cases. Monis v. Morris, 804 So.2d 1025, 1027(¶ 6) (Miss.2002). Therefore, we “will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied.” Id. (quoting Steen v. Steen, 641 So.2d 1167, 1169 (Miss.1994)).

1. Recrimination

¶ 7. In her first assignment of error, Patti contends that the chancellor erred in granting Billy a divorce because she asserts that the doctrine of recrimination bars him from obtaining a divorce. “The doctrine of recrimination is founded on the basis that the equal guilt of a complainant bars his/her right to divorce, and the principal consideration is that the complainant must come into court with clean hands.” Cherry v. Cherry, 593 So.2d 13, 18 (Miss.1991) (citing Oberlin v. Oberlin, 201 Miss. 228, 233, 29 So.2d 82, 83 (1947)).
¶ 8. Patti argues that Billy did not come to court with clean hands because he was having an affair at the time that he moved out of the marital home. Patti testified that Billy was responsible for the dissolution of the marriage, as he moved out of the marital home because he was having an affair with Sarah Reynolds. Billy testified that he met Reynolds in the summer of 2003 and that they became involved in a sexual relationship, which he described as being “off and on.” Billy also testified that he had told Patti about his affair with Reynolds.
¶ 9. Mississippi Code Annotated section 93-5-3 (Rev.2004) provides that: “If a complainant or cross-complainant in a divorce action shall prove grounds entitling him to a divorce, it shall not be mandatory on any chancellor- to deny such party a divorce, even though the evidence might establish recrimination on the part of such complainant or cross-complainant.” (Emphasis added). Thus, even though Billy admitted having an affair, the chancellor was not required to deny him a divorce when he had proven that Patti had also committed adultery. There is no merit to this issue.

2. Uncondoned Adultery

¶ 10. Billy and Patti admitted having extramarital affairs during their marriage. The record contains substantial details of a relationship between Patti and Ken Szilasi and a relationship between Billy and Tracy Szilasi, Ken’s wife. Based on our review of the record, we are convinced that at least one of the sexual encounters between Patti and Ken was condoned by Billy. However, the basis of Billy’s charge of uncondoned adultery stems from Patti’s sexual involvement with Stuart Irby. Patti testified that she and Irby first had sex when Irby spent the night at their home after a night of drinking with Billy. Patti stated that she went into the guest room where Irby was staying and that the two of them had sexual intercourse. Patti fur *274 ther stated that she had sex with Irby again a few months later.
¶ 11. Billy testified that he had become suspicious of Patti’s relationship with Irby, and he repeatedly asked her if she had been sexually involved with Irby. Patti told Billy that her relationship with Irby had been inappropriate, but she maintained that it had not been sexual. Unconvinced, Billy broached the subject with Irby in August 2004. Billy stated that Irby informed him that he had in fact had sexual intercourse with Patti. Nevertheless, Patti continued to deny that she had had sex with Irby. According to Billy, he did not learn from Patti that she had slept with Irby until her deposition on January 14, 2005.[1] After hearing the evidence, the chancellor granted Billy a divorce on the ground of uncondoned adultery.
¶ 12. Patti contends that Billy should not have been granted a divorce for two reasons: (1) because he condoned her adultery with Irby by having sex with her in January 2005 and (2) because he forgave her for committing adultery with Irby in a letter that he wrote to her on November 6, 2004.
¶ 13. On the night of January 1, 2005, Billy invited Patti to his home, and they had sexual intercourse after Patti agreed that she would not later claim that Billy, by having sex with her, condoned her adultery. Nevertheless, Patti later claimed exactly that. Patti argued before the chancellor, and argues now, that by having sex with her, Billy condoned her indiscretions with Irby because, according to Patti, Billy knew about her involvement with Irby when he had sex with her. Billy, on the other hand, argued that although Irby admitted to him in August 2004 that he had been sexually involved with Patti, he did not become certain until Patti’s deposition on January 14, 2005. The chancellor addressed Patti’s condonation argument in the following manner:
I do believe that Mr. Ware has proven by clear and convincing evidence that he is entitled to a divorce on the grounds of adultery and that the legal defense of condonation by Mrs. Ware does not rise to the level sufficient to prevent the Court [from] awarding him a divorce on adultery. Mr. White, I believe, has summarized it very well. As I understand the case law on the issue of condo-nation, it basically, more than anything else, seems to turn on the concept of forgiveness by the nonoffending spouse. And I don’t believe there’s any way that it can be said that Mr. — regardless of their sexual liaison after the separation, that Mr. Ware said that he was forgiving Mrs. Ware for the adulterous conduct. For one thing, he cannot forgive what he doesn’t believe. So, you know, you could look at it more than one way, I suppose. He said, as Mr. White has pointed out, that he wanted to believe his wife and did, despite what Mr. Irby directly told him. Mrs. Ware continued to protest that that was not accurate. So I’m not — neither am I very sure that, had he been considered to have believed it and forgiven her at that point, that his consent to have sexual relations with her and to resume the marital relationship was a free and voluntary act and not induced by some sort of fraud on Mrs. Ware’s part. The concept of condonation carries with it the express or implied agreement by both parties to resume the marital relationship, and I don’t believe the proof shows that they intended to do that.
*275 ¶ 14. We agree with the chancellor that Billy’s act of engaging in sexual relations with Patti is not sufficient for the defense of condonation to be applicable. In Lee v. Lee, 232 So.2d 870, 373 (Miss.1970) (quoting Bunkley & Morse, Amis on Divorce and Separation in Mississippi Section 4.02 (1957)), the Mississippi Supreme Court stated that:
Condonation is forgiveness of a marital offense theretofore committed, on condition that it will not be repeated and that the offender will thereafter treat the forgiving party with conjugal kindness. So long as the offending spouse observes the conditions on which the condonation rests, the unoffending spouse may not complain of the condoned offense, and in such a case a plea of condonation will be a valid defense to an action for divorce. But if the offense be repeated, the condoned offense is revived, and a plea of condonation will not be a valid defense. And the general rule is that if the offender be guilty of any other marital offense, the condoned offense is revived. In such cases the offender is placed on probation, and any subsequent grave or serious misconduct, indicating an intent or purpose not to keep or perform the conditions of the condonation in good faith, will be sufficient to avoid it, in itself. It is necessary also that the con-donation be free and voluntary. If it is induced by fraud, fear or force, it is of no effect.
We find that Patti’s defense of condonation must fail, as there is nothing in the record to suggest that Billy, by engaging in sexual intercourse with Patti, forgave her for committing adultery with Irby. According to Billy, he made it clear to Patti before she arrived at his home that he still wanted a divorce. As previously stated, he even asked Patti whether she would use their encounter against him at some later point. Apparently, the chancellor considered Patti’s act of claiming condonation, after she assured Billy that she would not, a form of fraud. Even though we agree with the chancellor that the record does not reflect that Billy condoned Patti’s adultery, we are not convinced that Patti’s actions constituted fraud under the circumstances of this case.
¶ 15. Patti also argues that Billy should not have been granted a divorce because he explicitly forgave her for her indiscretions in a letter that he wrote to her in November 2004. In the letter, Billy stated: “I’m not mad at you. I decided to forgive you for disrespecting me. I’ve even forgiven you for your adultery. I’ve reached a state of ambivalence. I just want to move [on] to try to be happy. You should think about moving on, too.” Patti argues that Billy was referring to her affair with Irby because he had known about it since August 2004 and had amended his complaint three months after Irby informed him that he and Patti had in fact been sexually involved. Patti also argues that the chancellor’s finding that “for one thing, he cannot forgive what he doesn’t believe” is error. The chancellor considered all of the evidence and determined that Billy could not have been referring to Patti’s relationship with Irby because in November 2004 he wanted to believe Patti, who at that point had not admitted having sex with Irby. Patti did not admit that she had been sexually involved with Irby until January 14, 2005. Although Billy stated that he forgave her in the letter, he did not specify which adulterous conduct he was referring to. Therefore, we find no error in the chancellor’s finding that Billy was not referring to Patti’s affair with Irby. “A chancellor sits as a fact-finder and in resolving factual disputes, is the sole judge of the credibility of witnesses.” Murphy v. Murphy, 631 So.2d 812, 815 (Miss.1994) (citing West v. Brewer, 579 So.2d 1261, *276 1263-64 (Miss.1991)). We will not second guess the chancellor’s finding, as he made it after listening to the evidence firsthand. This issue lacks merit.

3. Antenuptial Agreement

¶ 16. The Mississippi Supreme Court has held that fairly executed antenuptial contracts are just as enforceable as other contracts. Smith v. Smith, 656 So.2d 1143, 1147 (Miss.1995) (citing Estate of Hensley v. Estate of Hensley, 524 So.2d 325, 327 (Miss.1988)). Further, in Mabus v. Mabus, 890 So.2d 806, 819(¶ 53) (Miss.2003), the Mississippi Supreme Court also held that:
A duty to disclose is also of paramount importance.... However, “it is not now and never has been the function of this Court to relieve a party to a freely negotiated contract of the burdens of a provision which becomes more onerous than had originally been anticipated.” Estate of Hensley, 524 So.2d at 328 (citations omitted). “This Court will not disturb the chancellor’s opinion when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied.” McBride v. Jones, 803 So.2d 1168, 1170 (Miss.2002) (quoting Holloman v. Holloman, 691 So.2d 897, 898 (Miss.1996)).
¶ 17. Prior to then* marriage, Patti signed an antenuptial agreement wherein she agreed that Billy’s interest in his family’s business, Mid State Construction Company, Inc., as well as his interest in Ware Properties; Bradshaw, LLC; and Briar-wood West, LLC, would be considered nonmarital assets. Patti testified that she signed the agreement because Billy told her that it would provide security for his elderly parents and his young children in the event of his death.
¶ 18. Patti attacks the validity of the agreement, arguing that it was not fairly executed because Billy presented it to her at their home two days prior to their wedding.[2] According to Patti, she did not have an opportunity to read the agreement or to have an attorney review it before she signed it. As such, Patti claims that she felt somewhat pressured into signing the agreement. Patti also argues that the agreement was not signed before a notary public.
¶ 19. Billy recalled that the agreement was signed and notarized at his office, rather than at their home.[3] Billy testified that he presented the agreement to Patti “around the first of the month” and asked her to review it. Patti admitted that she and Billy had discussed an antenuptial agreement before he presented it to her, but she argues that Billy told her that he simply wanted to ensure that if anything happened to him, Patti’s creditors would not be able to come after assets that were derived from his family’s construction business and from his other properties.[4] Patti argues that Billy told her that the agreement contemplated death and not divorce, an explanation that she claims was a misrepresentation of what the agreement ac *277 tually provided. Thus, Patti argues that the chancellor erred in enforcing the agreement because she claims that she was misled and did not enter into the agreement knowingly or voluntarily. Patti also contends that the agreement is invalid because it provides that “each party has sought and obtained independent advice and counsel as to the execution of this document,” and she did not have advice from an attorney. We disagree.
¶ 20. There is nothing in the record which suggests that Patti was forced to sign the agreement. Moreover, Patti admitted that she did not read the contract and that she did not take it to an attorney to review it before she signed it. It is well established that “a person is under an obligation to read a contract before signing it, and will not as a general rule be heard to complain of an oral misrepresentation the error of which would have been disclosed by reading the contract.” Oaks v. Sellers, 958 So.2d 1077, 1082(1117) (Miss.2007) (quoting Stephens v. Equitable Life Assurance Soc’y of the U.S. 850 So.2d 78, 82(¶ 14) (Miss.2003)). Additionally, the Mabus court ruled that “independent counsel is not required to fairly execute a prenuptial agreement.” Mabus, 890 So.2d at 821(1163). It is Patti’s contention that the agreement is invalid because it provides that she obtained advice from an attorney when she had not done so. Patti cannot argue that the chancellor erred in upholding an agreement that she signed on the basis that the agreement reached a conclusion that was not true when, had she read the agreement, she would have discovered that it contained such a statement.
¶ 21. We also note that the antenuptial agreement did not cover the entire marital estate, and the chancellor équitably divided the remainder of the Wares’ property. Therefore, despite Patti’s contentions that “[t]he agreement protects Billy and makes no provisions for [her]” we point out that she received forty percent of the marital assets, valued at $234,436.60. We find that the record supports the chancellor’s finding that the agreement was fairly executed. This issue lacks merit.
¶ 22. THE JUDGMENT OF THE HINDS COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., CHANDLER, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR. GRIFFIS, J., NOT PARTICIPATING.

. During the hearings, reference was made to several depositions that had been taken; however, the transcripts of those depositions • are not a part of the record before us.

. Billy and Patti cohabited before they married.

. The antenuptial agreement reflects that it was entered into on January 30, 1992, but was notarized on January 29. The record does not adequately explain this discrepancy, as Billy testified that the agreement was executed prior to its being drafted, i.e., that the agreement was executed on January 29, 1992, but was not drafted until January 30. Nevertheless, this discrepancy is immaterial, as Patti admits that she signed the agreement, and there is no contention that she signed anything other than the agreement in question.

.Patti filed for bankruptcy prior to her marriage to Billy.