# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-01073-COA

**CHESTER C. THORNTON**                                                    **APPELLANT**

**v.**

**FELICIA L. THORNTON**                                                    **APPELLEE**

DATE OF JUDGMENT:          09/14/2018
TRIAL JUDGE:               HON. WAYNE SMITH
COURT FROM WHICH APPEALED: WALTHALL COUNTY CHANCERY
                           COURT
ATTORNEYS FOR APPELLANT:   DENNIS C. SWEET III
                           EDUARDO ALBERTO FLECHAS
ATTORNEY FOR APPELLEE:     TODD BRENTLEY OTT
NATURE OF THE CASE:        CIVIL - DOMESTIC RELATIONS
DISPOSITION:               AFFIRMED - 02/23/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE WILSON, P.J., WESTBROOKS AND McCARTY, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1. Felicia and Chester Thornton had been married for thirty-five years when Felicia filed a complaint for divorce on the grounds of habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences. Chester answered the complaint and denied that Felicia was entitled to a divorce. After a trial, the chancellor granted Felicia a divorce on the ground of habitual cruel and inhuman treatment. Chester appeals, arguing that Felicia presented insufficient evidence of habitual cruel and inhuman treatment and that Felicia's "unclean hands" are a bar to divorce. We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.　　Felicia and Chester married in 1981 and had four children during the marriage, all of whom are now adults. Felicia testified that she and Chester had separated on prior occasions, and she had even filed for a divorce in 2002 on the ground of habitual cruel and inhuman treatment. She voluntarily dismissed that complaint, and they reconciled. In December 2016, Felicia filed a complaint for divorce on the grounds of habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences. Felicia testified that she and Chester both still lived at the marital home, but they slept in separate bedrooms and had not had sexual relations in three years.[1] She testified that they had no communication at all.

¶3.　　Felicia claimed that she tried to communicate with Chester, but for the last three years, he would not speak to her. If he did speak, it was in an abusive manner. She said he usually ignored her if she spoke to him. She claimed that Chester told her he had nothing to say to her unless she would "obey" him. When he addressed her, he called her a devil, dumb, or stupid. He told her he was going "to get this devil out my house," meaning he would get Felicia out of the house. Felicia said that he had referred to her as dumb and the devil in front of their children. She said that it had been going on the entire marriage and that she wanted "to be free of it because it doesn't change."

¶4.　　The Thorntons' daughter Aria testified that she saw her parents several times each

---

[1] Felicia's December 2016 complaint alleged that she and Chester "separated" in May 2015 and were "no longer cohabiting." At the July 2017 trial, she clarified that they both still lived in the marital home but slept in separate bedrooms and did not "live together as husband and wife" and had not had sexual relations in three years.

week and observed no relationship between them. She said that the situation between her parents had been the same her whole life: "constant strife," "constant disagreement," and an "uncomfortable environment to be subject to." She testified that Chester often called Felicia a devil and talked down to her, including calling her stupid.

¶5. Chester admitted that he called Felicia "devil," but he explained that he was referring to the "devil that's in her, not her" per se. He testified that he still loved Felicia but that she was possessed by the devil.

¶6. Felicia testified that she and Chester had not engaged in sexual relations for three years. She testified that when Chester moved home after a temporary separation, "he . . . forcefully tr[ied] to get [her] to have sex with him." She testified that Chester tried to force her to have sex on "multiple" occasions, and "[h]e would come in and literally pry [her] body open." She testified that she did not want to have sex with Chester because he had already given her a sexually transmitted disease and because he told her that he was having sex with other women. She testified that to prevent Chester from forcing her to have sex, she squeezed his testicles hard.

¶7. Chester denied that he tried to rape Felicia and denied giving her a sexually transmitted disease. He testified that he and Felicia did have sex at least once in the last three years, but it is unclear when he alleged this occurred, and Felicia denied it. He said that he eventually stopped wanting to have sex with Felicia. As to the testicle-grabbing incident, he claimed that Felicia walked up to him out of the blue, grabbed him, and squeezed hard.

Chester claimed that Felicia squeezed him so hard that one of his testicles split in two. However, he had not sought medical attention for the alleged split testicle. He testified that he is "expecting [God] to fix whatever [his] problem is."

¶8. At the time of trial, Felicia was a school teacher and drove a school bus for the Walthall County School District. She had a bachelor's degree in education and was working on her master's degree. She had previously worked as a real estate agent and for a department store. Felicia had gone to cosmetology school, which Chester paid for. Chester would not help pay for her education courses. She paid for those herself.

¶9. Felicia testified that she received no financial support from Chester. He would not give her money for food or the home and spent all of his income on himself, except for the electric bill and the DirecTV bill. She said he would not pay for any of her needs "because that was my judgment for getting a job."

¶10. Felicia testified that Chester was generally very "tight" with his money. She denied that she had ever "blown" Chester's money, but she admitted that she had withdrawn money from an account they shared when she filed for divorce in 2002. Before she started working, Chester would give her $20 from each paycheck. After he stopped working, he would not spend any money on Felicia or their daughters. Felicia testified that she had to work three jobs to pay for things she wanted and needed. She had taken out a few small loans for her daughters' cars or other small things, and she did not consult Chester before doing so. She said that she saw no reason to discuss it with him because he did not contribute financially

4

to her life.

¶11.    Chester had worked for Georgia Pacific for thirty-five years before he was fired in 2012. He testified that he had put all four of his daughters through college and had paid off all of their debts. After leaving Georgia Pacific, Chester moved the money in his 401K to an IRA and changed one of his checking accounts because he said Felicia was withdrawing money from it without his knowledge. He testified that Felicia was a compulsive spender and had opened several credit cards in his name. He said that he had to contact the credit card companies to prevent Felicia from getting more cards in his name. He also testified that he had paid off some of the debts Felicia had incurred.

¶12.    Chester testified that shortly before trial, Felicia had gone on vacations to the Smoky Mountains and Disney World. He complained that she had no business spending money lavishly like that, but he acknowledged that he did not pay for the vacations. He testified that he paid all of the bills for the home but that Felicia bought most of the food. He denied that she needed to spend a lot of money on food because it was just the two of them, and he ate out most days. He said that Felicia was always trying to buy new things for their home that were unnecessary. He said that if an appliance broke, rather than trying to repair it, Felicia just wanted to buy a new one.

¶13.    Chester testified that Felicia wanted to go to college only because she was "jealous" of their daughters' degrees. At the time, Chester was still working for Georgia Pacific and did not want Felicia to work because he wanted to take care of her. He testified that he "let

her" drive to Hattiesburg for cosmetology school, but her cosmetology degree did not satisfy her. He then told her that she should learn to do taxes, and he sent her to school for that purpose. He testified that he paid for both the cosmetology and tax preparation courses. He said that he had not known that Felicia was getting an education degree online and that she had done that "sneakily." He explained that he did not want Felicia to work because he wanted to provide for her. He felt like she wanted to work so she could spend a lot of money. He disapproved of her spending, even though it was money she earned. He testified that Felicia "needs to submit to her husband." He disapproved of her job because he did not think that it was God's will for her to teach.

¶14. Another major point of contention between Felicia and Chester was the temperature in their house. Felicia testified that Chester told her that she needed to "get out" (i.e., leave) because she was "disobedient" and would not do as he commanded. She believed that Chester was trying to make her uncomfortable to force her out of the home. She said that he would turn the thermostat up to 78 degrees just to keep her uncomfortable and that he would physically shove her away from the thermostat if he saw her trying to lower the temperature. She claimed that on one occasion Chester pushed her down and put his hands around her neck after she tried to touch the thermostat. She said that this sort of physical force happened on several occasions, most recently two months before trial.

¶15. Felicia also alleged that Chester had disabled the washing machines and toilets to harass her. In addition, she claimed that Chester refused to cut the grass and instead brought

some horses into the front yard. She testified that when their refrigerator stopped working, Chester refused to remove it or allow her to buy a new one. Felicia eventually bought a new refrigerator, but Chester would not allow the delivery men to remove the old refrigerator from the home. Felicia said that the old, broken refrigerator sat in the middle of the kitchen until she took it apart and removed it piece by piece. Felicia believed that Chester's actions were all calculated to force her out of the house.

¶16. Aria corroborated Felicia's testimony. She testified that Chester would not let anyone adjust the temperature and that he had broken the washing machine to keep Felicia from using it. Aria testified that on one occasion, she heard her parents scuffling in a hallway at their house. When she looked to see what was happening, Felicia was on the ground and Chester had his hands on her, holding her down, while Felicia told him to stop. She did not see Chester actually push Felicia down. Aria testified that she believed Chester was trying to make Felicia uncomfortable in order to force her out of the home because he was angry that Felicia would not "abide by his rules."

¶17. Chester denied that he was trying to make Felicia uncomfortable or force her out of the home. He testified that he kept the thermostat high to save money. He claimed that when Felicia set the thermostat, everyone was wrapped up in blankets because it was too cold. He denied messing with the plumbing on the toilets and said that he had spent too much money on the house to "let it rot." He also denied that he refused to mow the yard. Chester testified that Felicia refused to try to have the old refrigerator repaired and bought a new one without

7

his permission. Chester explained that he did not want the delivery men to remove the old refrigerator because he wanted to fix it and use it outside. He now uses the refrigerator as a TV stand in the garage because Felicia had broken it beyond repair.

¶18.   Felicia testified that Chester owned several vehicles but that she was forbidden from driving any of them. At the time of trial, Felicia did not have a car and relied on her mother or her daughters to help her run errands. Felicia drove a school bus to and from school each day. Felicia testified that she had not driven one of Chester's cars in four years and that he had forbidden her from driving. Chester said she was trying to "show off" in town by driving his cars. She once tried to drive one of his cars to church. But when Chester heard the engine running, he came outside, opened the driver's side door, and threw her from the vehicle to the ground. Chester denied forbidding Felicia from driving his cars and denied pulling her from the vehicle.

¶19.   Felicia also testified that Chester had purposefully hit her with the refrigerator door. She said that while she was standing near the refrigerator, Chester forcefully pulled the door open and pushed it into her body. She alleged that Chester had beaten her at least twice in their marriage, though both incidents occurred prior to her 2002 divorce complaint. She testified that these beatings left bruises and that she lived in fear of Chester. She said that she mostly tried to avoid him because she was afraid that he would attack her.

¶20.   Chester denied ever abusing Felicia. He said that Felicia's testimony about him choking her in the hallway was a lie. He said that he was the one who had been physically

8

abused. He testified that on one occasion, Felicia unplugged his TV because she was angry that he was watching football. He testified that he did not want to fight with her, so he went to the kitchen for some chocolate milk. He said that Felicia followed him into the kitchen and attacked him while he was opening the refrigerator door. Chester said that on other occasions, Felicia threatened to poison him.

¶21. Felicia testified that she wanted a divorce because Chester was trying to force her from the home, and she was afraid for her safety. She testified, "He's already put me away . . . . We have nothing at all to do with each other, period." Chester testified that he was contesting the divorce because he was opposed to divorce for religious reasons. He said that Aria and Felicia had conspired to testify falsely in order to take the house from him.

¶22. After hearing the testimony, the chancellor granted Felicia a divorce on the ground of habitual cruel and inhuman treatment. Chester subsequently filed a motion to set aside the judgment or for a new trial, which was denied, and a notice of appeal.[2] On appeal, Chester argues that the chancellor erred in granting the divorce for three reasons: there was no "corroborating testimony" to support Felicia's claims, there was "no manifestation of injury," and Felicia has "unclean hands." We find no error and affirm.

---

[2] The parties agreed to bifurcate the trial. The chancellor entered an order granting Felicia a divorce in July 2017. A trial on all remaining issues was held in December 2017, and the chancellor entered a final judgment dividing the marital estate and denying any claim for alimony in September 2018. Chester then filed a motion to set aside the judgment or for a new trial, which the chancellor denied in June 2019. On appeal, Chester challenges only the chancellor's order granting Felicia a divorce and does not raise any financial issues.

ANALYSIS

## I. Habitual Cruel and Inhuman Treatment

¶23. Chester argues that the chancellor should not have granted Felicia a divorce because Felicia failed to present "corroborating testimony" and because there was "no manifestation of injury" to Felicia.

¶24. "We apply a limited standard of review" on appeal in a divorce case. *Littlefield v. Littlefield*, 282 So. 3d 820, 824 (¶5) (Miss. Ct. App. 2019). "As the trier of fact, the chancellor evaluates the sufficiency of proof based on the credibility of the witnesses and the weight of their testimony. Divorces based upon habitual cruel and inhuman treatment are necessarily fact-intensive and require a case-by-case analysis." *Id.* at 827 (¶19) (citation and quotation marks omitted). We "give[] deference to a chancellor's findings in regard to witness testimony, because the chancellor is able to observe and personally evaluate the witnesses' testimony and the parties' behavior." *McNeese v. McNeese*, 119 So. 3d 264, 275 (¶32) (Miss. 2013) (quotation marks omitted).

¶25. Mississippi Code Annotated section 93-5-1 (Rev. 2018) provides twelve grounds for divorce, including habitual cruel and inhuman treatment. A divorce on the ground of habitual cruel and inhuman treatment requires a showing by the preponderance of the evidence of

> conduct that either (1) endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or (2) is so unnatural and infamous as to make the marriage revolting to the nonoffending spouse and render it impossible for that spouse

to discharge the duties of marriage, thus destroying the basis for its continuance.

*Richard v. Richard*, 711 So. 2d 884, 889 (¶22) (Miss. 1998).[3]

¶26.    "The conduct must consist of 'something more than unkindness or rudeness or mere incompatibility or want of affection.'" *Horn v. Horn*, 909 So. 2d 1151, 1155 (¶7) (Miss. Ct. App. 2005) (quoting *Daigle v. Daigle*, 626 So. 2d 140, 144 (Miss. 1993)).  "Generally, to show habitual cruel and inhuman treatment, the offending party's cruel and inhuman conduct must be shown to have been systematic and continuous." *Id.*  However, our Supreme Court has recognized that "there are many kinds of acts such as wilful failure to support, verbal abuse, neglect, and the like which, if taken alone will not constitute cruelty, but when taken together will manifest a course of conduct as a whole which may amount to cruelty." *Rakestraw v. Rakestraw*, 717 So. 2d 1284, 1288 (¶10) (Miss. Ct. App. 1998) (brackets omitted) (quoting *Savell v. Savell*, 240 So. 2d 628, 629 (Miss. 1970)).

---

[3] Effective July 1, 2017, the statute was amended to specifically identify "spousal domestic abuse" as a form of habitual cruel and inhuman treatment.  S.B. 2680, Reg. Sess., 2017 Miss. Laws ch. 427, § 6.  As amended, the statute provides that "[s]pousal domestic abuse may be established through the reliable testimony of a single credible witness, *who may be the injured party*," thereby eliminating the corroborating-evidence requirement in such cases.  Miss. Code Ann. § 93-5-1 (emphasis added).  Felicia argues that because the trial in this case occurred after July 1, 2017, the amendment applies to her allegations of spousal abuse.  Chester argues that the amendment does not apply because the parties separated and Felicia filed for divorce prior to its effective date.  We decline to address the issue.  The chancellor granted Felicia a divorce on the ground of cruel and inhuman treatment generally without mentioning "spousal domestic abuse" specifically, and there is sufficient corroborating evidence to support the chancellor's finding.  Accordingly, the result is the same regardless of whether the amendment applies.

11

¶27. There must also be a "causal connection between the offending spouse's conduct and the impact on the offended spouse." *Culumber v. Culumber*, 261 So. 3d 1142, 1149 (¶21) (Miss. Ct. App. 2018) (quoting *Baggett v. Baggett*, 246 So. 3d 887, 892 (¶13) (Miss. Ct. App. 2017)). "Such an inquiry is subjective, and the focus is on the effect the conduct has on the particular spouse, not its effect on an ordinary, reasonable person." *Id.* (quoting *Baggett*, 246 So. 3d at 892 (¶13)).

¶28. A party claiming habitual cruel and inhuman treatment also must present some corroborating evidence of the offensive conduct. *Lindsay v. Lindsay*, 303 So. 3d 770, 781 (¶30) (Miss. Ct. App. 2020), *cert. denied*, 303 So. 3d 419 (Miss. 2020); *but see supra* note 3 (discussing a recent statutory amendment). "'[T]he corroborating evidence need not be sufficient in itself to establish the ground,' but rather 'need only provide enough supporting facts for a court to conclude the plaintiff's testimony is true.'" *Williams v. Williams*, 224 So. 3d 1282, 1287 (¶15) (Miss. Ct. App. 2017) (quoting Deborah H. Bell, *Bell on Mississippi Family Law* § 4.02[8][d], at 74 (2005)); *see also Anderson v. Anderson*, 190 Miss. 508, 200 So. 726, 728 (1941) ("[T]he corroborating evidence will be sufficient if it prove such substantial facts and circumstances as will serve to engender in a sound and prudently cautious mind a confident conclusion that the testimony of the complainant is true in all essential particulars, and is not the exaggerated product of . . . the consuming present desire for [a divorce.]").

¶29. In his order granting Felicia a divorce, the chancellor simply found that the testimony

12

showed "by a preponderance of the evidence" that Felicia was entitled to a divorce on the ground of habitual cruel and inhuman treatment. The chancellor found that "the testimony of [Felicia] and [Aria was] believable and credible" and that their testimony was "in numerous respects corroborated by [Chester]."

¶30. Felicia and Aria testified that Chester was trying to force Felicia out of the home. They both testified that Chester regularly and repeatedly called Felicia the "devil" and said that she was stupid. Felicia and Aria both testified that Chester was physically violent, and Aria witnessed one such incident. Felicia said that she lived in fear of Chester after he was physically violent with her and because of his controlling demeanor.

¶31. While Chester denied ever abusing Felicia, he admitted that he called her "the devil" (though he claimed he was not calling *her* the devil, just naming the devil within her). He denied purposely damaging the home, but he agreed that they fought frequently over the thermostat. He admitted that he objected to her efforts to obtain an education degree and become a teacher, and he characterized her as "jealous" and sneaky for having pursued the degree and new career.

¶32. Thus, as the chancellor pointed out, Chester admitted material aspects of the conduct that Felicia alleged, and his "admissions are sufficient corroboration to support the chancellor's findings." *Farris v. Farris*, 202 So. 3d 223, 232 (¶33) (Miss. Ct. App. 2016). Moreover, conduct supporting habitual cruel and inhuman treatment does not have to be physical abuse; evidence of emotional abuse may be sufficient if it is "more than mere

13

unkindness, rudeness, or incompatibility." *Reed v. Reed*, 839 So. 2d 565, 570 (¶19) (Miss. Ct. App. 2003) (quotation marks omitted). "Emotional abuse must fall more along the lines of habitual ill-founded accusations, insults and threats." *Id.* (citing *Holladay v. Holladay*, 776 So. 2d 662, 677 (¶64) (Miss. 2000)). Aspects of Chester's emotional abuse of Felicia were corroborated both by Aria and by Chester's own testimony.

¶33. Chester's brief argument that Felicia was not entitled to a divorce because there was "no manifestation of injury" is not entirely clear and is also without merit. As stated above, conduct that "creates *a reasonable apprehension* of . . . danger" to "life, limb, or health" is sufficient to support a divorce on this ground. *Richard*, 711 So. 2d at 889 (¶22) (emphasis added). Felicia testified that Chester had physically attacked her on multiple occasions and that she was afraid of him. Her testimony was sufficient to support the chancellor's finding.

¶34. In summary, there was ample evidence of physical and emotional abuse by Chester that was "more than mere unkindness, rudeness, or incompatibility." *Reed*, 839 So. 2d at 570 (¶19) (quotation marks omitted). Furthermore, material aspects of Felicia's allegations were corroborated by Aria and by Chester himself. Accordingly, we find no reversible error in the chancellor's finding of habitual cruel and inhuman treatment.

## II. Unclean Hands

¶35. Chester also argues that Felicia is not entitled to a divorce because she has "unclean hands." In support of this argument, Chester alleges that Felicia, inter alia, squeezed his testicles, wasted marital assets, and falsely accused him of giving her a sexually transmitted

14

disease. Felicia argues that Chester waived this issue by failing to raise it in the trial court. We agree that the issue is waived. *See, e.g.*, *Jurney v. Jurney*, 921 So. 2d 372, 377 (¶19) (Miss. Ct. App. 2005) (holding that the appellant is procedurally barred from raising new issues for the first time on appeal).[4]

**CONCLUSION**

¶36. There is substantial evidence to support the chancellor's order granting Felicia a divorce on the ground of habitual cruel and inhuman treatment.

¶37. **AFFIRMED.**

**BARNES, C.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR. CARLTON, P.J., NOT PARTICIPATING.**

---

[4] Procedural bar aside, Chester's argument sounds more like a "recrimination" argument. "The doctrine of recrimination is founded on the basis that the equal guilt of a complainant bars his/her right to divorce, and the principal consideration is that the complainant must come into court with clean hands." *Ware v. Ware*, 7 So. 3d 271, 273 (¶7) (Miss. Ct. App. 2008) (quoting *Cherry v. Cherry*, 593 So. 2d 13, 18 (Miss. 1991)). However, Chester did not raise this issue either, so it is also waived. *Carambat v. Carambat*, 72 So. 3d 505, 511 (¶28) (Miss. 2011). Moreover, Mississippi Code Annotated section 93-5-3 (Rev. 2018) provides that if a party seeking a divorce "shall prove grounds entitling him to a divorce, it shall not be mandatory on any chancellor to deny such party a divorce, even though the evidence might establish recrimination[.]" In other words, the defense is only discretionary, and "[e]ven if [Chester] had pleaded the doctrine of recrimination, it would not have precluded [Felicia] from being granted a divorce." *Carambat*, 72 So. 3d at 511 (¶28).

15