GRIFFIS, P.J.,
for the Court:
¶ 1. This appeal considers the divorce of Deidi and Mitchell Rodrigue. The chancellor granted Deidi a divorce on the ground. of uncondoned adultery and entered a judgment that resolved child custody, child support, equitable distribution, alimony, and all other issues between the parties. Deidi appeals the judgment. After consideration, we affirm in part and reverse in part. We remand this case to the chancellor for further proceedings consistent with this opinion.
FACTS
¶'2. Deidi and Mitch were married on June 3, 1989. They have three children. Macie has reached the age of majority. Madden was born in 1994, and she attended Petal High School. Mallori was born in 1997, and she attended Sacred Heart Catholic School.
¶ 3. Mitch is a football coach. They moved to Mississippi so that Mitch could become an assistant coach at the University of Southern Mississippi. Mitch is no longer employed by USM. He is currently an assistant coach at the University of Louisiana — Lafayette.
¶ 4. Deidi and Mitch moved often as Mitch pursued various football coaching jobs. During these years, Deidi worked various clerical and teaching-assistant jobs. Deidi is employed as an administrative assistant at USM.
¶ 5. Deidi and Mitch separated on July 15, 2010. Deidi filed for divorce on June 14, 2011. The complaint alleged that the was entitled to a divorce on the grounds of uncondoned adultery, habitual and excessive use of alcohol, habitual cruel and inhuman treatment, or in the alternative, irreconcilable differences. The chancellor issued a temporary order for custody, visitation, child support, and spousal support on November 4, 2011. A final hearing was held on April 23-24, 2012.
¶ 6. The chancellor issued his final judgment on August 31, 2012. Deidi was granted a divorce on the ground of uncon-doned adultery and was awarded custody of Madden and Mallori. Mitch was ordered to pay child support of $1,112.66 per month. They were ordered to share equally the minor children’s expenses for extracurricular activities and any health-related expenses not covered by insurance. The portions of the judgment related to the issues involved in this appeal are detailed below. It is from this judgment that Deidi now appeals.
STANDARD OF REVIEW
¶ 7. The Mississippi Supreme Court in Lowrey v. Lowrey, 25 So.3d 274, 285 (¶ 26) (Miss.2009), provided a detailed statement of the appropriate standard of review:
A chancellor’s findings of fact will not be disturbed unless manifestly wrong or clearly erroneous. However, the Court will riot hesitate to reverse if it finds the chancellor’s decision is manifestly wrong, or that the court applied an erro *1179 neous legal standard. A chancellor’s conclusions of law are reviewed de novo. The distribution of marital assets in a divorce will be affirmed if it is supported by substantial credible evidence. A chancellor is required to make findings of fact regarding all applicable Ferguson factors. Marital misconduct is a viable factor entitled to be given weight by the chancellor when the misconduct places a burden on the stability and harmony of the marital and family relationship. An equitable division of property does not necessarily mean an equal division of property. Fairness is the prevailing guideline in marital division.
(Internal quotations and citations omitted).
ANALYSIS

I. The chancellor erred in the calcula- ■ tion of equitable distribution, lump-sum alimony, and periodic alimony..

¶ 8. Deidi challenges the chancellor’s equitable division of assets and the award of alimony. In Ferguson v. Ferguson, 639 So.2d 921, 929 (Miss.1994), the Mississippi Supreme Court held:
There are some observations which need to be made in regard to division of marital assets. Initially, this Court notes that existing law regarding periodic alimony and child support is not altered. Upon dissolution of a marriage, the chancery court has the discretion to award periodic and/or lump sum alimony, divide real and personal property, including the divesting of title, and may consider awarding future interests to be received by each spouse. Additionally, homemaker contributions are not to be measured by a mechanical formula, but on the contribution to the economic and emotional well-being of the family unit. Some courts have held that equitable distribution of property has as its goal not only a fair division based upon the facts of the case, but also an attempt to finalize the division of assets and conclude the parties’ legal relationship, leaving them each in a self-sufficient state, where the facts and circumstances permit total dissolution.
Property division should be based upon a determination of fair market value of the assets, and these valuations should be the initial step before determining division- All property division, lump sum or periodic alimony payment, and mutual obligations for child support should be considered together. “Alimony and equitable distribution are distinct concepts, but together they command the entire field of financial settlement of divorce. Therefore, where one expands, the other must recede.” Thus, the chancellor may divide marital assets, real and personal, as well as award periodic and/or lump sum alimony, as equity demands. To aid appellate review, findings of fact by the chancellor, together with the legal conclusions drawn from those findings, are required.
In the final analysis, all awards should . be considered together to determine that they are equitable and fair.
(Internal citations omitted).
¶ 9. In Johnson v. Johnson, 650 So.2d 1281, 1287 (Miss.1994), the supreme court provided the proper sequence for the chancellor’s determination. ' First, the chancellor should determine whether the parties’ assets are marital or nonmarital. Id. Second, the marital property should be “equitably divided, employing the Ferguson factors as guidelines, in light of each party’s nonmarital property.” Id. Then, if the divided assets, when considered with each party’s nonmarital assets, “will adequately provide for both parties, no more need be done.” Id. If one party has a deficit, “then alimony based on the value of nonmarital assets should be considered.” Id.
*1180 ¶ 10. Here, the chancellor followed the proper procedure. The judgment was fifty-three pages and contained much detail.

A. Equitable Division of Marital Property

¶ 11. The chancellor first classified the parties’’ property as marital or nonmarital and then valued the property.
¶ 12. The parties owned a home in Petal. It was valued at $225,000, with a mortgage of $125,000 and equity of $100,000 (approximate figures used).
¶ 13. The chancellor determined that the parties had a total marital debt of $64,564.25. The chancellor determined that Mitch had a total debt of $47,755.26, but excluded two vehicle loans, Mallori’s tuition at Sacred Heart, the orthodontist bill for the children, and his Home Bank loan in Lafayette, Louisiana. Thus, the chancellor determined that Mitch’s total marital debt was $41,455.26. The chancellor determined that Deidi had a total debt of $32,608.99, but excluded $9,500 from two loans from her mother and sister to pay her attorney’s fees, which the chancellor found to be nonmarital debt. Thus, the chancellor determined that Deidi’s total marital debt was $23,108.99.
¶ 14. The chancellor determined that Mitch had retirement funds valued at $138,188.54, and Deidi had a retirement account valued at $8,241.67. The retirement accounts totaled $146,430.21.
¶ 15. The chancellor found the marital property to be valued as follows:
Home Equity $100,000.00
Debts ($64,564.25)
Retirement Funds $146,430.21
Total $181,865.96
¶ 16. The chancellor then made the following findings on the Ferguson factors:

1. Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:

a. Direct or indirect economic contribution to the acquisition of the property;

b. Contribution to the stability and hamony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and

c. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.

Both parties have worked during the marriage, and both have contributed directly and indirectly to the acquisition of marital assets. The Court has no authority to disregard a spouse’s economic contributions just because they were not in monetary form. A primary consideration in providing for a proper division of property is the economic contributions made by each party into the marriage, whether it be in terms of actual money earned or in terms of service without compensation.
Simply put, when one spouse, perhaps by picking up and moving the family and giving up jobs when the family moves, makes it possible for the other spouse to work at a job that requires frequent job changes, non-standard hours and travel on a regular basis and thereby earn more money, both spouse[s’] economic contributions must be taken into account in equitable distribution. Moreover, the debt incurred by the parties for the home was for family use during the marriage. The credit card debt incurred by Deidi[ ] was for daily expenses and necessities for herself and the children.

2. ■ The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or othe'rwise.

*1181 Deidi admitted that she may have had a spending problem, but it does not appear that she lives extravagantly. Mitch admitted that he sometimes bought meals for [his paramour] and that her diamond ring was in his car when the car was broken into. There was no proof presented, however, as to any amounts - that he might have spent on [her] or whether he purchased the ring for her. The $175.00 check from Mitch to [his paramour] was reimbursement for an impound fee for Mitch’s vehicle. The Court cannot attribute any dissipation to either party.

3. The market value and emotional value of the assets subject to distribution.

The assets subject to distribution appear to be of economic rather than emotional or sentimental value to the parties.

Jp. The value of the assets not ordinarily, absent equitable factors ,to the contrary, subject to distribution, such as property brought to the marriage by the parties and the property acquired by inheritance or inter vivos gift by or to an individual spouse.

Neither party appears to have any separate estate....

5. Tax and other economic consequences to third parties, of the proposed distribution.

Deidi testified that if she is allowed to claim both children, she will have head of household status, and Madden will qualify for a full Pell Grant, which will benefit Madden and both his parents. Mitch testified that unless he is allowed to claim at least one child or the house, he will suffer a great financial cost.

6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties.

In the context of the concepts under Armstrong and Cheatham, if at all possible, property division will be addressed to avoid periodic payments and/or responsibilities for either involving contact with the other once their relationship comes to an end. This factor is one that the appellate courts have strongly suggested be given great weight when there is no reason, other than children and their support, for the parties to have any continuing contact with each other after the demise of their marital relationship. In this case in particular, it appears that elimination of contact between these parties would serve not only the parties’ best interests but also their children’s best interests.

7. The needs of the parties for financial security with due regard to the combination of assets, income, and earning capacity.

Mitch’s income is significantly greater than Deidi’s and is likely to continue to be. Going forward, each party will have his/her separate estate and income.

8. Any other factor which in equity should be considered.

While Deidi will have primary physical custody of both minor children, Madden plans to attend ULL where Mitch works and coaches. Thus, Mitch will likely spend a significant amount of time and resources on Madden[,] although he is not technically the custodial parent. Since the entry of the Temporary Order, Mitch has been responsible for the payment of significant amounts of marital debt, namely that associated with the marital home and two vehicles. Marital debt lies within the factors set forth in Ferguson, as it may be defined as an “economic consequence” or as “any other factor which in equity should be considered.”
*1182 The Court has also considered that Mitch paid back [income] taxes the approximately $3,000.00 that Deidi received as a tax refund when she filed her 2010 taxes separately, then subsequently refiled jointly with Mitch, and that has been factored into the overall distribution.
(Citations omitted).
¶ 17. The chancellor then equitably divided the marital assets. First, the chancellor ordered that the marital home be sold and the “equity divided between the parties.” Deidi was granted use and possession of the marital home, and Mitch was ordered to pay the mortgage “for one year or until the house is sold, whichever comes first.” From the sale proceeds, Mitch was granted priority in the reimbursement of his mortgage payments. The chancellor added that “should the marital home not sell within one year from the date of this judgment, the parties shall return to this Court for further disposition of the marital home and debt.”
¶ 18. Second, the chancellor divided the personal property and the debt. Mitch and Deidi were each awarded their vehicle, and Mitch was ordered to pay the note on Deidi’s vehicle as “lump sum alimony paid over time.” This debt was not considered in the debt distribution. The chancellor also ordered the debt be divided with Mitch responsible for $32,797.18 and Deidi responsible for $18,204.66.
¶ 19. Finally, the chancellor divided the retirement funds. The judgment held “that Deidi is entitled to one-half (50%) of the total value of Mitch’s retirement funds[,] which totaled $138,188.54, or $69,094.27, less the value of her PERS retirement account, $8,241.67.” Thus, Deidi is entitled to a total of $60,852.60 from Mitch’s retirement funds.
¶ 20. As to Deidi’s claim that the chancellor was in error in the equitable division of assets, we will consider each category of assets separately.

1. Marital Home

¶ 21. The chancellor ruled:
The marital home at 118 Sweet Bay Trail in Petal shall be sold and the equity divided between the parties. Until the house is sold, Deidi shall have use and possession of the home and shall pay all utilities associated with the home. Mitch shall pay the mortgage note, only paying the monthly amount due of $1,168.00[,] which includes taxes and insurance, for one year or until the home is sold, whichever comes first. Mitch shall be allowed to claim the interest paid on the home mortgage as a deduction on his tax return until the home is sold. Prior to division of the proceeds from the equity in the home, Mitch shall be entitled to reimbursement of all house payments (which included the mortgage, taxes, and insurance) made since the Temporary Order of November 4, 2011[,] until the entry of this Opinion and also for any payments made after the entry of this Opinion until the sale of the home or one year from the date hereof, . whichever comes first. Mitch shall then be entitled to fifty percent (50%) of the proceeds from the sale of the home after satisfaction of all liens and all closing costs are paid[,] and Deidi shall then be entitled to fifty percent (50%) of the proceeds from the sale of the home after satisfaction of all liens and all closing costs are paid.
... Should the marital home not sell within one year from the date of this judgment, the parties shall return to this Court for further disposition of the marital home and debt.
¶ 22. Deidi argues:
Deidi was ordered to include the alimony payments in her gross income. Ivison v. Ivison, 762 So.2d 329 (Miss.2000) *1183 and 26 U.S.C. § 71 and § 215. Then, upon sale of the residence Mitch is entitled to recapture the entirety of the payments that he excluded from taxable income and Deidi included in her taxable income, and part of which[ ] were under a Temporary Support Order, and for all of which he was granted the mortgage interest deduction.
[[Image here]]
The effect of [Ivison] and 26 U.S.C. [§ ]71 on the Judgment of the Court is that Mitch is allowed an income tax deduction for all of the house payments he made under the Temporary Order and under the Final Judgment. Deidi is required to include those payments in her taxable income [under] 26 U.S.C. [§ ]71. Furthermore, upon the sale of the marital residence, Mitch recoups all of the house payments he made from the time of the Temporary Order. This is in addition [to] having claimed the interest, deduction and deducting the payment as alimony.... In other words, he gets the interest deduction, the alimony deduction, and then he is reimbursed the total amount of all of the house notes he has paid since November 4, 2011, before the equity is divided between the parties.
[Mitch] attempts to distinguish this case by stating the case involved an irreconcilable differences divorce and a settlement agreement. The distinction is meaningless because 26 U.S.C. [§ ]71 does not address the causes of divorce or the manner of issue resolution. [That statute] simply sets out the tax consequences in the event of divorce.
Ivison held that the tax laws in effect at the time of the Court’s Order, namely 26 U.S.C. [§§ ]71 and 215[,] were in effect. These laws provided that periodic alimony and mortgage payments would be taxable to [Deidi] and be deductible by [Mitch] unless they were designated as nontaxable and non-deductible.
Neither the Temporary Order nor the Final Judgment of Divorce designated those payments as not includable in gross income under 26 U.S.C. [§ ]71 and not allowable as a deduction under 26 U.S.C. [§ ]215. In fact, the Court Order gives Mitch the deduction.
¶ 23. Ivison considered the appeal of a modification action. Ivison, 762 So.2d at 332 (¶ 2). Leigh and Herb Ivison had signed a property-settlement agreement. Id. at (¶ 1). The agreement provided that Leigh would have use and possession of the marital home, and Herb would pay the mortgage payments until their youngest child reached the age of majority.- Id. at (¶ 4). Then, they would sell the home and split the remaining proceeds. Id. The agreement did not designate this payment as alimony or state whether the payment was deductible by Herb. Id. at (¶ 5). After Herb deducted the payment on his income tax return and Leigh did not include it as income in her return, the Internal Revenue Service audited Leigh; this resulted in Leigh being assessed a tax liability for the mortgage payment. Id. at (¶ 6). Leigh then asked for a ruling from the IRS as to whether the payments were deductible by Herb and taxable income to her. Id. at (¶ 7). The IRS ruled that the payments were alimony and should be included as income in her return. Id. Leigh, through a modification action, asked the chancellor to rule that these payments were child support, i.e., not taxable income to her, and require Herb to reimburse her the taxes paid. Id.
¶24. The supreme court determined that it was error for the chancellor to modify the property-settlement agreement based on the intent of the parties. Id. at 335 (¶ 18). Further, the court concluded that “neither Leigh nor Herb address[es] the tax consequences of the mortgage payments in the divorce agreement. Further *1184 more, the testimony is void of any evidence that the issue was ever discussed between Leigh and Herb or their attorneys.” Id. at 336 (¶ 24). The court held that it was error for the chancellor to “add a provision to the existing divorce agreement” when there was no agreement between the parties as to tax consequences of the mortgage payments in their agreement. Id. at (¶ 25).
¶ 25. The court then considered “[w]hether the court’s ruling was contrary to the clear language of the United States Tax Code and that ignorance of the tax laws should not allow Leigh to modify the parties’ contract.” Id. The court ruled:
The Internal Revenue Code, 26 U.S.C. § 71, provides what payments to, or on behalf[ ] of[,] a former spouse, are considered alimony which must be included in the payee’s gross income. Furthermore, § 215 provides that [the] payor spouse may deduct amounts which qualify as alimony under § 71.
Under 26 U.S.C. § 71(b)(1)(B) of the Internal Revenue Code, “all alimony payments are included in the payee’s income and may be deducted by the payor unless the divorce agreement specifically designates them as beyond the scope of §§ 71 and. 215. This “designation” must be specific.” Id.
Herb and Leigh’s divorce agreement does not address the tax effects of alimony. The silence of a divorce agreement with respect to whether support payments are taxable does not render that agreement ambiguous and open to interpretation. In fact, the Internal Revenue Code provides for what should happen in this exact circumstance. The divorce agreement must specifically state that mortgage payments are not to be considered taxable under § 71. If there is no such designation, then such payments are deemed to be deductible by the payor and included in the payee’s gross income. If Leigh and Herb had intended for the mortgage payments not to be taxable to Leigh, they had the opportunity to include such a designation in their property settlement agreement to that effect. Treas. Reg. § 1.71-lt(b), Q & A-6, Q & A-8 (1984). Since no specific designation exists in Leigh and Herb’s agreement, the Internal Revenue Code controls what payments are deductible by Herb and taxable to Leigh. 26 U.S.C. § 71.
Chancellors must consider the estimated amount of income taxes the respective parties must pay on their incomes when detemining the provisions of a divorce agreement. Parsons v. Parsons, 678 So.2d 701, 703 (Miss.1996). It was incumbent for Leigh and Herb to rely upon their tax advisor or attorney to advise them of the tax consequences of the divorce agreement. Both testified that this was not done. Nonetheless, ignorance of the tax laws is not a basis for modification of the divorce agreement.
Ivison, 762 So.2d at 336-37 (¶¶ 26-29) (emphasis added).
¶ 26. In Ivison, the court clearly held that “[chancellors must consider the estimated amount of income taxes the respective parties must pay on their incomes when determining the provisions of a divorce agreement.” Id. at 337 (¶ 29). Yet we note that the authority for this ruling was from Parsons, where the court simply restated the factors to consider in determining alimony from Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss.1993)— . one of those factors being the tax consequences of the spousal-support order.
¶ 27. Here, it appears that the chancellor intended for Mitch to receive the mortgage-interest deduction on his tax return. However, there is nothing in the judgment that would indicate that the chancellor *1185 viewed this as alimony or that the chancellor intended for Deidi to incur taxable income for the payment as alimony. The chancellor did not designate the mortgage payment as alimony.
¶ 28. Nevertheless, we are compelled to find that the chancellor failed to “consider the estimated amount of income taxes the respective parties must pay on their incomes when determining the provisions of a divorce agreement.” Ivison, 762 So.2d at 387 (¶ 29). We therefore reverse the chancellor’s judgment as to the marital home and remand this matter for the chancellor to consider the proper income-tax consequences that flow from the payment of the mortgage.

2. Debts

¶ 29. Deidi next argues that the chancellor incorrectly calculated and assigned the liabilities of the parties. She claims that the chancellor found that Mitch’s total debt was $32,797.18. This amount included $1,103.33 for car tags, which Mitch was not ordered to pay, and $14,648.64 for taxes and attorney’s fees.
¶ 30. We find that the chancellor was in error as to the Sacred Heart Catholic School debt. The chancellor’s judgment does not assign responsibility for payment of this debt. In fact, the chancellor does not find it to be marital debt. The chancellor concluded, “[A]s the Court is not inclined to direct where children must attend school absent unusual circumstances, the Court does not consider ongoing tuition at a private school to be a “debt” in the true sense of the word, but rather an expense that the parties may incur if they so choose.”
¶ 31. There was no dispute that Mallori attended Sacred Heart Catholic School, a private school. Mitch’s Rule 8.05[1] financial information indicated a liability, or balance due, to Sacred Heart in the amount of $6,300. This indicates that Mitch and Deidi owe Sacred Heart for tuition. There is nothing to indicate that this payment is for future years. Instead, Mitch’s disclosure indicates that the balance is due. 'Thus, it appears to be an obligation that Deidi and Mitch had agreed to pay, so that their child could attend school for a certain session. As an obligation of the parties, it should have been considered marital debt, and it should be paid. The chancellor is obligated to assign responsibility for the payment of this debt.
¶ 32. The chancellor’s finding appears to consider whether Mallori will attend Sacred Heart in the future. The chancellor decided that he would not require Mitch to pay the tuition in the future. This is a separate issue. Clearly, Mitch listed a liability to Sacred Heart in the amount of $6,300; this appears to be for tuition, and that had been agreed to by the parties during the term of their marriage. It must be considered a marital debt. We find it was reversible error for the chancellor to fail to include the Sacred Heart tuition as a marital debt and assign responsibility for its payment. We therefore reverse the chancellor’s judgment as to the Sacred Heart-tuition debt and remand this matter for the chancellor to consider the proper allocation of responsibility for this marital debt.

3. Retirement Funds

¶ 33. Deidi argues that the chancellor erred in the division of the retirement accounts. The chancellor determined that Deidi’s and Mitch’s retirement accounts were marital property and held that Deidi was entitled to one-half of the total value of Mitchell’s retirement funds. The chancellor determined that Mitch’s retirement accounts were valued at $138,188.54, and Deidi’s retirement account was valued at $8,241.66. The chan *1186 cellor then gave Deidi one-half of Mitch’s retirement account and deducted the value of Deidi’s retirement account.
¶ 34. As to the retirement accounts, the chancellor ruled:
The Court finds all accumulations and contributions made to the parties’ individual retirement funds prior to the entry of the Temporary Order to be marital property. There was no testimony or evidence offered to establish that any accumulations or contributions were made subsequent to the entry of the Temporary Order on November 4, 2011, nunc pro tune for October 14, 2011.
IT IS, FURTHER, ORDERED AND ADJUDGED that Deidi is entitled to one-half (50%) of the total value of Mitch’s retirement funds[,] which totaled $138,188.54, or $69,094.27, less the value of her PERS retirement account, $8,241.67. Thus, Deidi is entitled to a total of $60,852.60 from Mitch’s retirement funds. This distribution shall be made in the following manner: Deidi shall be entitled to $60,852.60 of Mitch’s ING Annuity account. These benefits to Deidi shall be divided and distributed by use of a Qualified Domestic Relations Order utilized by the plan administrator within 60 days following entry of this Final Judgment. Mitch shall be entitled to the remainder. Mitch shall further be entitled to the entirety of his ING Asset Allocation Account and his AXA Equitable Account.
¶ 35. Deidi’s first argument is simple. She claims that the chancellor made a mistake in his addition. In the judgment, the chancellor itemized Mitch’s retirement accounts as follows:
AXA Equitable . $47,259.0
ING Annuity 89,614.00
ING Asset Allocation 2,315.53
Total $138,188.54
Deidi is correct that the correct sum is $139,188.53. Based on the chancellor’s findings and the correct addition, Deidi is entitled to an additional $1,000 in the retirement funds.
¶ 36. Deidi also argues that the chancellor committed error in the division of the retirement accounts. The chancellor determined that the retirement accounts were marital property, and the chancellor determined that Deidi was entitled to one-half of the value of Mitch’s retirement account. Deidi’s complaint is that the chancellor’s reduction of her' share of Mitch’s retirement account by the entire value of her retirement account left her with less than one-half of the total of both parties’ accounts.
¶ 37. The chancellor’s calculation is as follows:
Mitch’s retirement accounts $138,188.54 /2
Deidi’s share $69,094.27
Less Deidi’s account $8,241.67
Deidi’s share of Mitch’s retirement accounts $60,852.60
Based on this calculation, Deidi was awarded the total of $69,094.27 from both her’s and Mitch’s marital retirement accounts.
¶ 38. Deidi claims that the chancellor should have used the following calculation:
*1187 [[Image here]]
Thus, Deidi claims that she was shortchanged $4,620.83 in the division of the retirement accounts. Her argument is based on the fact that both parties’ retirement accounts were determined to be marital property, and the chancellor decided that they should be divided equally but failed to do so.
¶ 39. The chancellor did not explain any reason that Deidi should receive less than one-half of the retirement funds. In fact, the chancellor determined that Deidi is entitled to one-half of Mitch’s accounts and then proceeded to give her less than one-half of the marital retirement accounts.
¶ 40. In Lauro v. Lauro, 847 So.2d 843, 850 (¶ 17) (Miss.2003), the Mississippi Supreme Court determined that since the case was remanded for further consideration of equitable division, the chancellor should be instructed “to revisit the awards of alimony and child support after he has properly classified and divided the marital assets.” Thus, since this case has been remanded for further consideration of equitable division, on remand the chancellor will have all the tools of marital dissolution available: equitable division, lump-sum alimony, and periodic alimony. Likewise, the chancellor may revisit the division of the retirement funds.

B. Alimony

¶ 41. After the marital property is equitably divided, the chancellor must consider whether the division, in light of the parties’ nonmarital assets, will adequately provide for both parties; if so, then “no more need be done.” Johnson, 650 So.2d at 1287. The chancellor’s judgment does not make this conclusion. In fact, the chancellor ordered alimony, so we consider whether the alimony was correctly awarded.
¶ 42. The final step requires that the chancellor decide if an equitable division of marital property, considered with each party’s nonmarital assets, leaves a deficit for one party; if so, then alimony should be considered. Id. The chancellor determined that alimony was appropriate, and the judgment held:
Having considered all of the foregoing, the Court finds the payment by Mitch of Deidi’s car note on the Honda Pilot ($329.95 per month with a balance of $13,562.41 as presented at trial), of which she will have exclusive use, ownership and possession, to be an appropriate amount of lump sum alimony paid over time. Mitch is obligated to make at least the minimum payments due on the loan until the loan is paid in full. If he chooses to pay the loan off at an accelerated rate, and thus satisfy the obligation in a shorter amount of time and by paying less interest, he will be deemed’to have also satisfied his obligation to Deidi as to alimony.
¶43. The chancellor considered the Armstrong factors:

1. The income and expenses of the parties.

Mitch’s income is currently greater than Deidi’s, and is likely to continue to be. The Court has considered the testimony of each as to their current living circumstances, income and expenses. Deidi’s net monthly pay is $2,457.53 per Exhibit 10[,] which includes child support. Mitch’s net monthly pay is $5,546.30 per Exhibit 14.

*1188
2. The health and earnings capacity of the parties.

Both are in good health and capable of earning at capacity.

3. The needs of each party.

Both have the normal everyday needs viewed “necessaries” in modern society for food and drink, clothing, shelter, and transportation. Both will have separate assets and income going forward.

k. The obligations and assets of each party.

The debt on the marital home, and personal debt including credit card debt are summarized and fully discussed in detail in the Ferguson analysis and the testimony and exhibits further discussed above.

5. The length of the marriage.

The parties were married for 23 years. The court has considered Deidi’s request for alimony and Mitch’s objection thereto as set forth herein.

6. The presence or absence of minor children in the home, which may require that one or both parties pay[] or personally provide child care.

Deidi has primary physical custody of the two minor children of the parties, but both of those children are teenagers, one about to leave for college and the other about to get her driver’s license within the next several months, so the Court does not anticipate that either party will incur child care expenses.

7. The age of the parties.

Deidi is 48 years old. Mitch is 47.

8. The standard of living of the parties, both during the marriage and at the time of the support determination.

The parties appear to be living a middle class lifestyle with an average debt load on the marital home, and also a considerable amount of consumer debt.

9. The tax consequences of the spousal support order.

Normally, alimony paid by a spouse is deductible by the payor and taxable to the payee.

10. Fault or misconduct.

Mitch admitted the ground of uncon-doned adultery. Both parties described conduct on behalf of the other party that made the marriage unharmonious at best.

11. Wasteful dissipation of assets by either party.

As stated above, the Court cannot attribute any dissipation of assets to either party.

12. Any other factor deemed by the Court to be “just and equitable” in connection with the setting of spousal support.

None.
¶ 44. The chancellor also considered the Cheatham factors:[2]

1. Substantial contribution to the accumulation of the payor’s total wealth by quitting work to become a homemaker or assisting in the spouse’s business.

Mitch’s job changes required Deidi to move fairly often and “start over” in climbing the ladder, so to speak.

2. A long marriage.

Twenty-three years is a long marriage in the context of this factor.

3. The recipient spouse has no separate income, or the separate estate is meager by comparison.

Although Deidi, the party requesting alimony, will have a separate income and estate, her income is meager compared to Mitch’s earnings which, as stated above, are roughly four to five times that of Deidi.

*1189
L The recipient spouse ivould lack financial security without the lump-sum award.

Deidi will lack financial security without the lump-sum award.
¶ 45. Deidi’s argues that the award of alimony is inadequate. “In the case of a claimed inadequacy ... of alimony, [the appellate court] will interfere only where the decision is seen as so oppressive, unjust or grossly inadequate as to evidence an abuse of discretion.” Armstrong, 618 So.2d at 1280. We find such is the case here. The chancellor’s findings clearly indicate that Deidi is entitled to an award of periodic and/or lump-sum alimony. After making these findings, the chancellor awarded Deidi lump-sum alimony with a total value of $13,562.41. Further, the alimony was an asset — a motor vehicle — with 100,000 miles on it.
¶ 46. Here, we find that the award of alimony is unjust and grossly inadequate based on the findings of the chancellor. We reverse the chancellor’s award of lump-sum alimony of $13,562.41 and remand the case for further consideration of an appropriate lump-sum or periodic alimony award.

II.Child Support and Attorney’s Fees

¶ 47. Deidi argues that the chancellor committed error in the computation of child support and by not awarding her attorney’s fees. As set forth above, in Lauro, the Mississippi Supreme Court determined that since the case was remanded for further consideration of equitable division, the chancellor should be instructed “to revisit the awards of alimony and child support after he has properly classified and divided the marital assets.” Lauro, 847 So.2d at 850 (¶ 17). Thus, since this case has been remanded for further consideration of equitable division of assets and alimony, on remand, the chancellor will have all the tools of marital dissolution available: equitable division, lump-sum alimony, and periodic alimony. Likewise, the chancellor may revisit the awards of child support and attorney’s fees.

III. Private-School Tuition, College Education, and Life Insurance

¶ 48. Deidi also contends that the chancellor erred by not ordering Mitch to: continue paying the tuition and expenses of the parties’ minor child at Sacred Heart, contribute to the college education of the two minor children, and maintain a life-insurance policy naming Deidi as beneficiary until he is no longer obligated to pay child support or alimony.
¶ 49. Mitch responds that Deidi has failed to cite authority to support the claims. Thus, Mitch claims that this precludes appellate review of those claims. See Price v. Clark, 21 So.3d 509, 543 (¶ 100) (Miss.2009); Griffith v. Griffith, 997 So.2d 218, 225 (¶25) (Miss.Ct.App.2008). See also M.R.A.P. 28(a)(6). Mitch is correct. Deidi’s failure to cite authority would normally preclude our review, of these issues.
¶ 50. However, based on Lauro as stated above, since this case has been remanded for further consideration of equitable division of assets and alimony, on remand the chancellor will have all the tools of marital dissolution available: equitable division, lump-sum alimony, and periodic alimony. Likewise, the chancellor may revisit the issues related to private-school tuition, college education, and life insurance.

IV. The chancellor erred in not ordering Mitch to abstain from alcohol when exercising visitation with the minor children.

¶ 51. Deidi argues that the chancellor erred by not ordering Mitch to abstain from alcohol when exercising visi *1190 tation with the minor children. Deidi cites the evidence in the record outlining Mitch’s excessive drinking as well as the costs associated with his drinking. Where a chancellor has made factual findings on the matter of visitation, this Court will not disturb those findings unless there is credible evidence that he has committed manifest error or applied an erroneous legal standard. Bredemeier v. Jackson, 689 So.2d 770, 775 (Miss.1997).
¶ 52. Here, we find that the chancellor did not abuse his discretion in his award of visitation without the restriction of Mitch abstaining from alcohol. The chancellor made findings of fact and conclusions of law based on the Albright factors[3] and awarded joint legal custody to both Deidi and Mitch, with primary physical custody to Deidi and liberal visitation for Mitch.
¶ 53. The judgment extended the “Temporary Order restriction that neither parent shall consume alcoholic beverages to excess in the presence of their child or children.” As a result, the chancellor considered Mitch’s alcoholic consumption and specifically directed that both parents refrain from excessive alcoholic consumption in the presence of the minor children. Therefore, we find that this issue has no merit.
¶ 54. THE JUDGMENT OF THE CHANCERY COURT OF FORREST COUNTY IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
LEE, C.J., BARNES, ISHEE, ROBERTS, CARLTON, MAXWELL AND JAMES, JJ„ CONCUR. IRVING, P.J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. FAIR, J„ NOT PARTICIPATING.

. UCCR 8.05.

. Cheatham v. Cheatham, 537 So.2d 435, 438 (Miss.1988).

. Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983).