# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-01380-COA

**THERON L. WHITLOCK**                                           **APPELLANT**

**v.**

**VENETTA M. WHITLOCK**                                          **APPELLEE**

DATE OF JUDGMENT:               11/28/2023
TRIAL JUDGE:                    HON. JENNIFER T. SCHLOEGEL
COURT FROM WHICH APPEALED:      HARRISON COUNTY CHANCERY
                                COURT, FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:         TAMEKIA ROCHELLE GOLIDAY
ATTORNEY FOR APPELLEE:          PATRICIA C. CHAMPAGNE
NATURE OF THE CASE:             CIVIL - DOMESTIC RELATIONS
DISPOSITION:                    REVERSED AND REMANDED -
                                10/21/2025
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., LAWRENCE AND McCARTY, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     Theron and Venetta Whitlock were married in Oceanside, California, on October 10, 1994, and later moved to Gulfport, Mississippi.  Three children were born during the marriage, all of whom were emancipated by 2023. Venetta also had one child by a previous relationship.

¶2.     Theron and Venetta temporarily separated in 2009. Theron filed for divorce, but the couple reconciled six months later, and Theron withdrew his claim of divorce. The couple permanently separated on August 13, 2017. On March 5, 2018, the chancellor entered an order nunc pro tunc to January 25, 2018, awarding the parties joint legal custody of the three

children and granting Theron sole physical custody of them.[1] Venetta was ordered to pay $282 per month in child support. Theron was required to maintain health, dental, and vision insurance coverage for the children and pay all their medical-related expenses not covered by insurance. The parties were required to equally split the children's extracurricular expenses.

¶3.     On October 2, 2019, Venetta filed a complaint for divorce against Theron on the grounds of habitual cruel and inhuman treatment, adultery, or, in the alternative, irreconcilable differences. Venetta did not ask for alimony, temporary alimony, or spousal support of any kind. She did, however, ask for an "equitable distribution of the marital assets." On November 13, 2019, Theron filed an answer to Venetta's complaint for divorce and a counterclaim for a divorce on the ground of desertion or, in the alternative, irreconcilable differences.

¶4.     On September 30, 2021, Venetta filed a motion for temporary relief and requested "the Court [to] award her temporary alimony." On May 18, 2022, Venetta filed an amended complaint for divorce. In her amended complaint she requested "lump sum and periodic alimony." This was the first time Venetta requested this type of alimony.

¶5.     On August 2, 2022, the court entered an agreed temporary order nunc pro tunc to May 29, 2022, in which Venetta was awarded $22,967.92.[2] The parties agreed that $22,967.92

---

[1] This order was discussed in the transcript but was not in the record on appeal.

[2] It is unclear why the court entered a nunc pro tunc order when it awarded a partial marital property distribution.

was half of Theron's Thrift Savings Plan (TSP) as of October 1, 2017. The chancellor's order stated that the $22,967.92 awarded to Venetta "shall be in the nature of property division, the final determination of an equitable division of property to be decided by the court at trial on the merits."

¶6.    On April 6, 2022, Theron requested ore tenus that Venetta be relieved from her child-support obligations. Venetta stopped paying Theron her court-ordered child-support payments around September 2021, even though she was ordered to pay until January 2023. That was the month when their youngest child reached the age of majority. On April 14, 2022, the court granted Theron's ore tenus motion and stopped the child-support payments.

¶7.    On January 6, 2023, Venetta filed her answer to Theron's counterclaim for divorce and later filed her affirmative defenses to the counterclaim for divorce. On July 5, 2023, Theron filed his answer to Venetta's amended complaint for divorce and reasserted his counterclaim for divorce.

¶8.    Also on July 5, 2023, the couple consented to an irreconcilable differences divorces and agreed to submit the following issues for the chancellor to decide:

1.    Wife's entitlement to periodic alimony and the amount of such alimony.
2.    Wife's entitlement to lump sum alimony, and the amount of such alimony.
3.    Wife's entitlement to Husband's Thrift Savings Plan, and the amount of such entitlement.
4.    Wife's entitlement to a portion of Husband's FERS account, and the amount of such entitlement.
5.    An equitable division of personal property of both parties.
6.    An equitable division of real estate of both parties.
7.    Husband's entitlement to the Wife's retirement account(s).

3

8.  Husband's entitlement to the Wife's monetary account(s).

9.  Husband's entitlement to child support arrearage, college expenses and issues related to health insurance and insurance premiums related to the children.

10.  Equitable division of marital debt.

¶9. The trial of this matter occurred on July 5-6, 2023, and October 4 and 6, 2023. Theron testified that in 1994 he and Venetta were dating but separated because "she had met someone else." While they were separated, Venetta called Theron, and her "exact words were, '[W]e need to get married because I'm pregnant.'" Theron testified that he believed the child to be his own and decided to marry Venetta based on that belief. Theron and Venetta named the child after Theron. However, when the child was around ten years old, Theron started to have doubts that the child was his because "[t]he child did not look like [Theron,]" and "[t]he child did not look like [Venetta]." Whenever Theron would bring up the topic of the child's paternity, Venetta would assure Theron that the child was biologically his. Around 2006, when the child was twelve years old, a paternity test revealed that the child was not Theron's son. Theron testified that he still lived in the marital home.

¶10. Theron testified that he received a monthly gross income of $6,576.87 from his job as a mail carrier for the United States Postal Service. He testified that he also received monthly VA disability checks in the amount of $1,900. In total, his monthly gross income was $8,476.87. Through Theron's employment as a mail carrier, he had a TSP. Theron testified that in April 2022 his TSP was valued at $83,661.35, and he took out a $30,000 loan against his TSP for legal fees for the divorce and to consolidate his debt. The loan agreement

4

stated that "[i]f you are covered by the Federal Employees['] Retirement System or you are a member of the uniform services and you are married (even if separated from your spouse) your spouse must consent to your loan." However, Theron never obtained Venetta's consent for the loan. When asked how he was able to get the loan without Venetta's consent, he stated that he "could not really see clearly everything on" the form because he filled it out on his cell phone. Theron explained that he "didn't do it [without Venetta's consent] purposefully."

¶11.    Theron testified that he and Venetta had disagreements. He explained that Venetta would get "mad" and "scream" and "holler." Theron testified that "at times she would . . . grab knives." Theron explained that on one occasion, Venetta "came up from behind, and she stabbed [Theron] in [the] elbow." He testified that it cut the skin and that he still has a scar, but he did not seek medical attention because he "just tried to deal with it" himself. He also testified that on a separate occasion, Venetta again threw a knife at Theron. The knife sliced Theron's left leg and resulted in him going to the hospital, where he received thirteen staples to close the "long" and "deep" cut. Theron testified that he had never touched Venetta with a knife, hit her, or attempted to choke Venetta or any other woman.

¶12.    Venetta testified that her and Theron's marital problems began "soon after" they got married. She explained that Theron was "verbally abusive" and that their marriage was "[s]tressful, tiring . . . [and] depressing." She also explained that their marriage became violent and involved "a lot of hollering" and physical altercations. Venetta testified that "the

5

police was called numerous times . . . like, three or four times." Venetta explained that in 2003, she called the police "because [Theron] choked [her]," adding that Theron's mother pulled him off of her (Venetta). Venetta also testified that when she was about three months pregnant she "got pushed to the floor" by Theron. Later, when Venetta was five or six months pregnant, Theron "grabbed [Venetta], like, in a chokehold."

¶13.    Venetta testified that during the course of their marriage, she "left" the marital home "a few times." She explained that she was unsure how many times she left, but she estimated it was "five" or "it could [have] be[en] more, it could [have] be[en] less." In 2009, after Theron filed for a divorce, Venetta and her two daughters left the home from around February to August. Venetta took her clothes and "most of the furniture" that was in the marital home. She testified that she and her daughters were "only gone a short period of time" until they moved back in with Theron and brought back the furniture. The couple reconciled, and Venetta moved out permanently in 2017.

¶14.    Venetta testified that while she and Theron were still together, Theron wanted her to help financially. Venetta testified that she paid "the light bill," "the water bill," and her own bills, such as her car note. She explained that she "[did not] make a lot of money" and was only "working part time," so she "[could not] pay a lot of the bills."

¶15.    Venetta testified that after she and Theron separated, she did not receive support from Theron. She testified that she "looked for full-time work" after she and Theron separated, and "[she] always applied for full-time work" but "never got the full-time [work], so [she]

6

just took what [she] could get." At the time of the separation in 2017, she worked part-time for a department store. In 2020, Venetta found a full-time job as a deputy clerk at the Justice Court for Harrison County, Mississippi, where she worked for the last two years and started to accumulate a Public Employees' Retirement System (PERS) account. Venetta testified that her 2022 W-2 tax statement indicated that she made $30,126.62 working for the justice court.

¶16.    Venetta explained that she paid $300 a month to live with her mother for the majority of the time she was separated from Theron. Venetta could not find a suitable and affordable rental house or apartment. She asked the court to award her enough money by way of alimony to be able to rent an apartment or house on her own. Venetta provided the court with a list of rental homes and apartments she researched while living with her mother. She explained that she found a house that cost $1,200 per month to rent, which she testified was comparable to the marital home.

¶17.    Venetta testified that her daughters were fourteen and seventeen years old at the time Venetta moved out permanently in 2017. Venetta explained that she "didn't want to leave [her] children" and leaving her children was "not something [she] planned to do," but they were "at the age where they [told] [Venetta] they want[ed] to stay" in the marital home. Venetta testified she did not want to agree with her girls staying with Theron because "[she] wanted [her] girls," but she "just couldn't stay."

¶18.    After hearing the testimony, the chancellor found that Theron should be solely responsible for the payment of the outstanding mortgage, taxes, and insurance on the marital

7

home.[3] The chancellor reasoned that "Theron currently lives in the marital home . . . and the parties agree[d] for him to continue to do so if he desires." The chancellor found that Venetta was entitled to all the equity in the marital home, valued at $35,000. The chancellor ordered that $5,000 of the $35,000 in equity was to be immediately paid to Venetta, and the remaining $30,000 paid within three years of the chancellor's final judgment. The chancellor reasoned in her order that

> had Venetta received spousal support from the time of the filing of the divorce on October 2, 2019 in the amount of $1200.00 per month, she would have received approximately $57,600 over the course of time until now. Instead she lived with relatives and received no financial help from Theron.[4]

¶19. The chancellor also found that one-half of the interest in the TSP at the time of demarcation was $59,710.48.[5] Venetta received $22,967.92 of the TSP in April 2023. The chancellor awarded Venetta $16,173.76, which represented the remaining balance of her one-half interest in the TSP, plus the accretion in the value of the TSP that accrued from the date of demarcation to the date of the final judgment. The chancellor also ordered that "Venetta is further entitled to an additional $20,000.00 from said Thrift Savings Plan, for a total of $36,173.76." The $36,173.76 was in addition to the $5,000 that Theron was ordered to pay

---

[3] The marital home was appraised to have a value of $125,000, and there was a mortgage of $90,000, which left $35,000 in equity in the marital home.

[4] It appears the chancellor considered this $1,200 monthly alimony because Venetta testified that the house she was hoping to rent, which was comparable to the marital home, cost $1,200 per month.

[5] The court determined that the date of demarcation was October 2, 2019.

Venetta for the equity in the house. The chancellor reasoned that Venetta deserved more than half of Theron's TSP because

> Theron and Venetta both contributed to the accumulation of these assets. Theron by virtue of his employment, and Venetta by virtue of her contributions to the marriage, i.e. her working, payment of household expenses, and contributing to the care and support of the children and home.

The chancellor also stated that "Theron's behavior and his treatment of Venetta during the marriage was the primary cause of the deterioration of the marriage and the final separation in 2017."

¶20. The chancellor also ordered that $2,820 be deducted from Venetta's award due to her failure to pay child support from April 2022 to January 2023. The chancellor also awarded Venetta an interest in Theron's retirement pension with the Federal Employees Retirement System (FERS), which is to be calculated once Theron retires.

¶21. As for alimony, the chancellor ordered Theron to pay Venetta $1,200 per month in permanent periodic alimony. The court's reasoning for awarding Venetta the alimony was that "Theron ha[d] greater earning capacity and ha[d] for the entire marriage of 29 years." Furthermore, the chancellor stated that "Venetta ha[d] improved her earning capacity with little help from Theron, but it is still far below that of Theron." Lastly, the chancellor reasoned that "Venetta should not be required to deplete [the $22,967.92 in TSP funds she previously received] to support herself."

¶22. Aggrieved, Theron appealed the final judgment and argues that the chancery court's marital-property distribution award was wholly unjustified and inequitable and, therefore,

9

should be reversed. He also argues that the chancery court committed reversible error when awarding Venetta permanent periodic alimony in an amount that exceeded both her reasonable needs and his ability to pay.

**STANDARD OF REVIEW**

¶23.   "This Court has a limited standard of review in examining and considering the decisions of a chancellor." *Ravenstein v. Ravenstein*, 167 So. 3d 210, 215 (¶8) (Miss. 2014). We "will not disturb the factual findings of a chancellor when supported by substantial evidence unless [we] can say with reasonable certainty that the chancellor abused his discretion, was manifestly wrong, [or] clearly erroneous[,] or applied an erroneous legal standard." *Biglane v. Under the Hill Corp.*, 949 So. 2d 9, 13-14 (¶17) (Miss. 2007) (quoting *Cummings v. Benderman*, 681 So. 2d 97, 100 (Miss. 1996)).   We use a de novo standard when analyzing questions of law. *Id.*

**ANALYSIS**

**I.     Equitable Distribution**

¶24.   Theron argues that the chancellor's distribution of the marital property was "wholly unjustified and inequitable." Although the chancellor expressly analyzed each of the *Ferguson*[6] factors, Theron argues that the chancellor's findings "led to significantly disparate property distribution, which is unfair and highly inequitable." Venetta received a total of $91,320.74 in marital assets, not including any portion she is entitled to from Theron's FERS

---

[6] *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994).

retirement pension. The chancellor awarded Venetta $38,353.75 from the TSP and $35,000 from the equity in the marital home, for a total of $73,353.75.[7] In addition, in April 2023, Venetta received $22,967.92 from Theron's TSP as a "partial property division." These figures equal $96,321.67. Furthermore, the chancellor determined that the "ultimate value of [the FERS retirement pension] will not be determined until Theron retires" but awarded Venetta a portion of Theron's monthly retirement "based upon the duration of the marriage, and the number of years Theron has worked for the United States Government at the time of his retirement." The chancellor also ordered Theron to pay $1,200 per month in alimony. Theron claimed that he was only awarded $3,379.79 from his TSP account and allotted $90,000 in marital debt. Theron's monthly adjusted gross income was $6,439.70, and his monthly expenses and liabilities were $5,732.98. He had $706.72 left over each month but was ordered to pay $1,200 a month in alimony, which left him with a deficit. The chancellor essentially placed Theron in a $493.28 deficit each month.

¶25.    "[W]hen dividing marital property, chancellors are to (1) classify the parties' assets as marital or separate; (2) determine the value of those assets; (3) divide the marital estate equitably . . . ; and (4) consider the appropriateness of alimony if either party is left with a deficiency." *Faerber v. Faerber*, 150 So. 3d 1000, 1005 (¶12) (Miss. Ct. App. 2014) (internal quotation marks omitted).

---

[7] The $38,353.75 amount is the total of Venetta's $20,000 and $16,173.75 awards from Theron's TSP, plus the $5,000 payment from the equity in the marital home, reduced by the chancellor's $2,820 deduction due to Venetta's failure to pay child support.

¶26. Once the marital and separate property are distinguished, "[c]hancellors apply the

*Ferguson* factors to marital property to make an equitable distribution of the property." *Ward*

*v. Ward*, 131 So. 3d 1244, 1248 (¶13) (Miss. Ct. App. 2014). The *Ferguson* factors are:

1. Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:
   a. Direct or indirect economic contribution to the acquisition of the property;
   b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and
   c. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.
2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.
3. The market value and the emotional value of the assets subject to distribution.
4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;
5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;
6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;
7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,
8. Any other factor which in equity should be considered.

*Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994).

¶27. "[T]he goals of equitable distribution are a fair division of marital property based on

the facts of each case and termination of the legal relationship in a manner which each party

may realize self-sufficiency." *Seymour v. Seymour*, 960 So. 2d 513, 519 (¶15) (Miss. Ct. App. 2006). "[A]n equitable division of property does not necessarily mean an equal division of property." *Chamblee v. Chamblee*, 637 So. 2d 850, 863-64 (Miss. 1994). Rather, "**fairness** is the prevailing guideline in marital division." *Ferguson*, 639 So. 2d at 929 (emphasis added).

¶28. Theron cited the case of *Baumbach v. Baumbach*, 242 So. 3d 193 (Miss. Ct. App. 2018), to support his argument that the chancellor erred in distributing the marital estate. In *Baumbach*, the chancellor addressed the division of marital assets and debts between Robert and Jennifer Baumbach following their divorce. *Id.* at 196 (¶1). The chancellor awarded Jennifer the marital residence and one-half of its equity, her 401(k) and Roth IRA, twenty-five percent of Robert's 401(k), and a portion of Robert's military pension, totaling over $250,000. *Id.* at 198, 204 (¶¶15, 33). Robert was awarded the couple's other real estate holdings, which had a negative value of $357,000, and his thrift savings plan valued at $21,900, and he was ordered to pay $1,500 per month in rehabilitative alimony for thirty-six months, $1,817 per month in child support, all private-school tuition and fees, and approximately $2,400 per month in mortgage payments on the marital estate. *Id.* Robert appealed and argued the chancellor erred in the equitable distribution of the marital assets. *Id.* at 199 (¶18). This Court agreed with Robert and explained that Jennifer received more than $250,000 in marital assets, not including her share of Robert's pension. *Id.* at 203-04 (¶33). In contrast, Robert was assigned approximately $700,000 in marital debt, which

13

entirely offset the value of the assets allocated to him and left him with a net negative value, even when accounting for his retirement accounts. *Id.* at 204 (¶33). This Court noted that "it is undisputed that Robert's income is substantially greater than Jennifer's." *Id.* However, this Court stated that "we cannot see how awarding Robert all of the marital debt associated with the couple's real estate is equitable." *Id.* Accordingly, this Court found that the chancellor abused her discretion in the division of marital property, and we remanded for a new equitable distribution. *Id.* at (¶34).

¶29.     Here, Venetta was awarded over $90,000 in marital assets, not including what she is to receive from Theron's federal retirement pension. However, due to the $90,000 in marital debt assigned to Theron, the net value of marital assets attributed to Theron was minimal. It is undisputed that Theron's income is greater than Venetta's, and, as the *Baumbach* case stated, it is not always equitable to award one party all the marital debt because that party has a substantially greater income. *Id.* at (¶33). The equitable distribution of marital property requires a holistic assessment of both parties' financial circumstances, contributions to the marriage, and future economic prospects. *See Ferguson*, 639 So. 2d at 928. We cannot see how awarding Theron all the marital debt, while awarding Venetta a substantial portion of the marital assets, seems fair and equitable.

¶30.     As part of the chancellor's *Ferguson* analysis and in an effort to justify a lopsided distribution, the court found that "[h]ad Venetta received $1,200.00 per month in spousal support from the date of the filing of the Complaint for Divorce, she would have received

14

approximately $57,000.00 over the course of time." The chancellor found that Theron failed to pay Venetta "$1,200.00 per month in spousal support from the date of the filing of the Complaint for Divorce," which was October 2, 2019, despite not being under any court order to do so. Notably, Venetta did not request spousal support in her original complaint filed on October 2, 2019. In fact, Venetta did not request spousal support until nearly two years later, on September 30, 2021, when she filed a motion for temporary relief requesting that the court award her temporary alimony. The court valued that two-year period at $1,200 per month, totaling $28,800. The chancellor's equitable distribution of the marital property appears to be based, at least in part, on Theron's failure to pay spousal support during that two-year period in which no such request had been made.

¶31. Accordingly, we find that the chancellor abused her discretion in the division of marital property. We remand for the chancellor to reassess the equitable distribution, taking into account that spousal support was not requested until September 30, 2021. The chancellor's reliance on $57,000 in back spousal support was in error since $27,600 of that figure, representing the twenty-three months between October 2019 and September 2021, was not requested nor sought by Venetta. The chancellor's entire equitable distribution stemmed from that mistaken spousal support determination, which substantially altered the entire marital property landscape, preventing an equitable division.

II.     Alimony

¶32. Theron also argues that the chancellor erred by awarding Venetta $1,200 per month

15

in permanent periodic alimony because it exceeded both her reasonable needs and her husband's ability to pay. Again, the chancellor relied on non-support for Venetta for a time period she did not request it. The chancellor explained:

> [H]ad Venetta received spousal support from the time of the filing of the divorce on October 2, 2019 in the amount of $1200.00 per month, she would have received approximately $57,600 over the course of time until now.

The chancellor's reasoning for awarding Venetta $1,200 per month in alimony was that Theron failed to support Venetta while they were separated. The chancellor also reasoned that "Venetta has improved her earning capacity with little help from Theron." However, Theron "provided for the household while [Venetta] worked part time and went to school." Furthermore, Venetta did not take any financial responsibility for her children while they were separated.

¶33. "After the marital property is equitably divided, the chancellor must consider whether the division, in light of the parties' nonmarital assets, will adequately provide for both parties; if so, then 'no more need be done.'" *Rodrigue v. Rodrigue*, 172 So. 3d 1176, 1187 (¶41) (Miss. Ct. App. 2014) (quoting *Johnson v. Johnson*, 650 So. 2d 1281, 1287 (Miss. 1994)). The chancellor should consider alimony if the equitable division of marital property, considered with each party's separate property, "leaves a deficit for one party." *Id.* at (¶42). A deficit occurs when "the spouse seeking alimony is left 'with a deficit with respect to having sufficient resources and assets to meet his or her needs and living expenses.'" *Layton v. Layton*, 181 So. 3d 275, 282 (¶17) (Miss. Ct. App. 2015) (emphasis omitted) (quoting

16

*Jackson v. Jackson*, 114 So. 3d 768, 777 (¶22) (Miss. Ct. App. 2013)). If a party is left with a deficit, the chancellor must do an analysis of the *Armstrong* factors to determine the amount and type of alimony that should be awarded. *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993). The *Armstrong* factors are:

1. The income and expenses of the parties;
2. The health and earning capacities of the parties;
3. The needs of each party;
4. The obligations and assets of each party;
5. The length of the marriage;
6. The presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care;
7. The age of the parties;
8. The standard of living of the parties, both during the marriage and at the time of the support determination;
9. The tax consequences of the spousal support order;
10. Fault or misconduct;
11. Wasteful dissipation of assets by either party; or
12. Any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support.

*Id.*

¶34. "Whether or not to award alimony and the amount of alimony is largely within the discretion of the chancellor." *Parsons v. Parsons*, 678 So. 2d 701, 703 (Miss. 1996) (citing *Creekmore v. Creekmore*, 651 So. 2d 513, 517 (Miss. 1995); *Cherry v. Cherry*, 593 So. 2d 13, 19 (Miss. 1991)). This Court will not disturb the award on appeal unless it is found to be against the overwhelming weight of the evidence or manifestly in error. *Id.* (citing *Creekmore*, 651 So. 2d at 517; *McNally v. McNally*, 516 So. 2d 499, 501 (Miss. 1987)). However, the reversal of a chancery court's division of marital property ordinarily requires

17

reversal of an alimony award. *Hearn v. Hearn*, 191 So. 3d 129, 133 (¶17) (Miss. Ct. App. 2016). For example, in *Mace v. Mace*, 818 So. 2d 1130, 1334 (¶16) (Miss. 2002), the supreme court directed the chancellor to reconsider the award of periodic alimony after the chancellor properly determined the value of the husband's medical practice. The supreme court determined:

> The chancery court's valuation of the practice is reversed, and this case is remanded for an adequate valuation of the practice. Also, the award of alimony is vacated, and the chancellor instructed to revisit the issue as alimony and equitable distribution should be considered together. *Ferguson*, 639 So. 2d at 929 (stating that though alimony and equitable distribution are different concepts, they should be considered together, as when one expands, the other must recede).

*Id.*; *see also Lauro v. Lauro*, 924 So. 2d 584, 588 (¶14) (Miss. Ct. App. 2006) ("Periodic alimony is to be reconsidered when the marital estate is redistributed under principles of equitable distribution."); *Segree v. Segree*, 46 So. 3d 861, 866 (¶13) (Miss. Ct. App. 2010) ("[W]hen a case is remanded for further consideration of the division of marital assets, this Court must also remand on the issue of alimony as the proper distribution of the parties' assets and debts may affect the amount of alimony ultimately awarded." (internal quotation marks omitted)).

¶35.   In the case of *Yelverton v. Yelverton*, 961 So. 2d 19 (Miss. 2007), James and Rhonda Yelverton were married in September 1988 and were divorced in February 2022. *Id.* at 21 (¶2). The chancellor awarded Rhonda lump sum alimony in the amount of $250,000, child support in the amount of $2,500 per month, periodic alimony in the amount $2,500 per

month, twenty-five percent of James's annual adjusted gross income above $150,000, and $10,000 in attorney's fees. *Id.* The chancellor determined that James was capable of making $12,000 a month after taxes. *Id.* at 28 (¶17). However, the chancellor also determined that James's reasonable monthly expenses were $6,429. *Id.* After factoring in the $10,000 support obligation, James's total monthly expenses jumped to $16,429, which left him with a deficit of $4,429 per month. *Id.* at (¶18). James appealed and argued that the chancellor erred in awarding Rhonda (1) lump sum alimony in the amount of $250,000; (2) $2,500 in monthly child support; (3) $2,500 in monthly periodic alimony; (4) an additional twenty-five percent of James's income over $150,000; and (5) $10,000 in attorney's fees. *Id.* at 23 (¶3). As to the issue of periodic alimony, the Mississippi Supreme Court found that "[s]uch action by the chancellor leaves James destitute and in hopeless continuous contempt of court" and that "the chancellor should consider all payments of support and division of property together to arrive at an equitable and fair result, on this issue and all other issues." *Id.* at 28-29 (¶¶18-19). Thus, the Mississippi Supreme Court reversed and remanded both the equitable distribution and alimony awards. *Id.* at 29 (¶19).

¶36.    While Theron's monthly deficit is nowhere near as large as James Yelverton's, he nevertheless has a deficit when alimony payments are factored into the financial equation. Theron's 2023 Rule 8.05 financial statement indicated that he only had a total of $706.72 each month after expenses. *See* UCCR 8.05. His gross income was $6,576.87. He also received V.A. disability income each month in the amount of $1,900. His monthly adjusted

19

gross income was $6,439.70, and his monthly expenses and liabilities were $5,732.98. Therefore, the chancellor placed Theron in a deficit each month. The chancellor reasoned that:

> Theron included in his living expenses a church donation of $200.00 per month. Although this is an admirable donation, the Court finds that it is not a necessary living expense. Also Theron listed food expenses for himself of $700.00 month, which the Court finds is inflated. As for Theron's monthly liability payments, both his car payment of $568.00, and the Thrift Savings loan payment of $543.32 are debts incurred by him in 2022, knowing at the time that Venetta was requesting financial relief from him in this action.

This reasoning seems to punish Theron for purchasing a car when he "was having problems with the engine and problems with the air-condition" and taking out a loan on his TSP to pay for the divorce's legal fees and consolidate his debt. Furthermore, even if Theron were to reduce his "inflated" food expenses for himself and his two daughters who reside with him, as well as eliminate the $200 monthly church donation, he would still be operating under a deficit.

¶37. Venetta's Rule 8.05 financial statement indicated that her gross monthly income was $2,668.03. Her adjusted monthly gross income was $2,009.10, and her total monthly expenses were $2,461. Furthermore, she was awarded $90,000 in marital assets, while Theron was awarded $90,000 in marital debt. She requested the $1,200 in alimony to cover the cost of her rent for a home that was comparable to the marital home and had three bedrooms. However, Venetta testified that she did not "necessarily need a large house, [and she] just wanted something that [was] comfortable to live in." Although "[t]he award of

20

alimony and the amount of any such award is largely within the discretion of the chancellor," *Monroe v. Monroe*, 745 So. 2d 249, 252 (¶13) (Miss. 1999), we must reverse the alimony award since it should be considered with the new equitable distribution. Alimony and equitable distribution "should be considered together, [and] as when one expands, the other must recede." *Mace*, 818 So. 2d at 1134 (¶16) (citing *Ferguson*, 639 So. 2d at 929). "Thus, when a case is remanded for further consideration of the division of marital assets, this Court must also remand on the issue of alimony as the 'proper distribution of the parties' assets and debts may affect the amount of alimony ultimately awarded[.]'" *Segree*, 46 So. 3d at 866 (¶13) (quoting *Fitzgerald v. Fitzgerald*, 914 So. 2d 193, 198 (¶¶26-27) (Miss. Ct. App. 2005) (citing *Lauro v. Lauro*, 847 So. 2d 843 850 (¶17) (Miss. 2003)). Accordingly, we must reverse and remand on this issue as well.

## CONCLUSION

¶38. We reverse the chancery court's judgment and remand for further proceedings consistent with this opinion. On remand, the chancellor should reconsider the equitable distribution of the marital assets and debts and the award of alimony.

¶39. **REVERSED AND REMANDED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.**